**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION**

DAVID ANDERSON, ROBERT
BALLERO GONZALEZ, DENEEN
BROWN, JONATHAN CARANO,
DENNIS FETT, CLAYTON FINEOUT,
BONNIE FLORENTINE, NINOTCHKA
HARPER-BEY, MARK HARTMAN,
MICHAEL HAYES, BRAD HOSCHAR,
STEVE ISBISTER, BRANDY KNAPP,
RENEE LESESNE, RENE MADUENO,
JAMES MCCRORY, JANICE
MCKENNON, LORETTA MITCHELL,
BRYAN POLO, STEVEN AULA, RYAN
CLARK, LATRICIA FORD, SHEILA
HALL-HUDSON, ROSALIND
HUDSON-BATTIE, HANNAH JONES,
AARON JOPHLIN, TYLER BAKER,
ANTHONY WAYNE BROWN,
VINCENT CERRATO, JR., WILLIAM
ARTHUR GUEST JR., NICOLE HEARN,
JIMMY HERRERA, CARA TAYLOR
LONG, TRACY MILES, DOUGLAS
PHILIP PAULSON, PATRICIA
TAYLOR, JORDAN TRIBBLE, ANITA
VICTORY, JULIE WALLING, DAVID
WINSLOW, JOHN BRITTON, JOHN
BRITTON, CELESTE FELICE,
STEPHEN GEARHART, ENIKO GEDO,
EVA JACINTO, PATRICIA JONES,
MATTHEW KAKOL, FRANCINE
LEWIS, KRISTEN LUIZ, RITTIE
MARSHALL, ANTHONY
RASPANTINI, NICOLE SENKPEIL,
SHONA THOMAS, MELISSA
WARREN, MARIE HUDSON, LEIGH
SCHULTZ, BILLY SELLERS,
MATTHEW SHEPHARD, BOBBY
SIMS, BRENDA SMITH-WATSON,
LATASHA TINCH, MICHAEL
TROPEA, ELIZABETH VALENZUELA,
GEORGE WELCH, THERESA WOLLE,
KENNETH ALLAN, MOISES ALONSO,

Civil Action No. _____

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED
(VOLUME I)

DAVE BACON, LEATHA BARBER,
BRANDON BARKER, BRIAN
BELANGER, RACHED BELHADJ,
LISAMARIE BLUMBERG, TINA
BROWN, CHRISTOPHER CARTER,
KATRINA CHAMBLISS, CORBY
CLINE, WILLIAM DEMELE, MARCOS
DIAZ, MANAKIA EILAND, GREGORIO
ESCOBEDO, JAMARIA FERNANDEZ,
HARLEY GRAFF, DOUGLAS HALL,
WESTLEY HAMNER, NATASHA
HOCHSTETLER, STACEY KABIR,
JOHN KOMOROSKI, TIFFANY
MARVIN, DANIEL MCCARTHY,
LATUNDER MERCADEL, SCOTT
MILEWSKI, FELICIA OWENS, KARA
PETSCHEN, ANITA REDDICK,
JEFFREY RHOADES, JEFFREY
SLUSHER, CHAD SORENSON,
TONJUA SPECK, GILBERT STARKEY,
DWAYNE STOWE, JULIE STRUBLE,
FRANK TALAVERA, MICHAEL
THOMAS, NELSON YERGER, JAIME
DURAN, PRESHAWN LONG,
ELISABETH LOVETT, PATRICIA
MOBLEY, RYAN TAYLOR, RICHARD
TOPA, BOBBIE & TROIS WHITE,
EARL WILSON, and RONALD WOLF,

       Plaintiffs,

  v.

ARC AUTOMOTIVE, INC.,

       Defendant.

# I. INTRODUCTION

1. Approximately two months ago, on April 27, 2023, the National Highway Traffic Administration ("NHTSA") informed ARC Automotive, Inc. ("ARC") that NHTSA had "tentatively concluded that *a defect related to motor vehicle safety exists* in the frontal driver and passenger air bag inflators under investigation that were produced before installation of borescopes on all toroidal inflator manufacturing lines in January 2018 (emphasis added).[1] NHTSA demanded that ARC recall the defective inflators ("Defective Inflators") and "issue a Part 573 Recall Report addressing the safety defect."[2] NHTSA noted that ARC's 67 million Defective Inflators are contained in the driver and passenger frontal airbag modules of vehicles manufactured by at least 12 major vehicle manufacturers.[3] Most of these vehicles likely are on the road today, and tens of millions of people are at risk of serious injury or death. The vehicles affected by the inflator defect ("Inflator Defect") are the Class Vehicles in this case, and the owners and lessees of those vehicles are Plaintiffs and Class Members.

2. NHTSA described the defect as the presence of loose weld "slag" or

---

[1] Letter from S. Ridella, Director, Office of Defects Investigation, NHTSA, to S. Gold, Vice President – Product Integrity, ARC (Apr. 27, 2023), attached as Exhibit A.

[2] *Id*.

[3] *Id*. at 1-2.

*Footnote continued on next page.*

"flash" in the interior of the Defective Inflators.[4] This loose piece of metal flash can become dislodged during a crash and block the Defective Inflators' single ventilation port. As NHTSA found, "ARC's inflator design is such that during a triggered deployment, the stored gas, excited by the propellant, has a single path through the exit orifice to exit the inflator and fill the air bag cushion."[5] If a piece of loose weld flash blocks the ventilation exit port during deployment, the large volume of gas trying to travel from the inflator to the air bag cushion over-pressurizes the metal inflator, which causes a rupture that can result in "metal [inflator] fragments being forcefully propelled into the passenger compartment."[6]

3.      NHTSA concluded that the Defective Inflators "pose an unreasonable risk of death or injury," and that "[a]n airbag inflator that ruptures when deploying in a vehicle is plainly defective."[7] Confirming the obvious, NHTSA determined that "[a]irbag inflators that project metal fragments into vehicle occupants, rather than properly inflating the attached air bag, create an unreasonable risk of death and

---

[4] *Id*. at 2. Within the industry the material at the seam of two parts joined by friction welding is commonly referred to as "flash," which is the term Plaintiffs use herein instead of "slag." *See* "Whiteboard Wednesday: Friction Welding Flash," Manufacturing Technology, Inc., available at https://blog.mtiwelding.com/whiteboard-wednesday-friction-welding-flash.
[5] *Id*. at 2. *Id*. at 2.
[6] *Id*.
[7] *Id*. at 4-5.

*Footnote continued on next page.*

injury."[8]

4.     ARC rejected NHTSA's demand.[9] Instead of recalling the Defective Inflators, ARC "strongly" disagreed with NHTSA. ARC attacked NHTSA's authority, mischaracterized the statements in NHTSA's detailed six-page letter as "not based on any objective technical or engineering conclusion," despite acknowledging that NHTSA had been investigating the issue for years, and called the defect in its inflators "hypothetical" even though it had caused numerous documented ruptures, injuries, and fatalities.[10]

5.     This indifference to the safety of millions of motorists stands in stark contrast to ARC's portrayal of itself as a responsible company focused on safety, as expected of a manufacturer of airbag inflators. On its official website, ARC promises that "safety" and "integrity" are its core values. In its May 11, 2023 response letter to NHTSA, ARC repeatedly made similar claims; for example, "The safety of the motoring public is a cornerstone of our business." This is demonstrably untrue. Not only did ARC defy NHTSA and refuse to recall its Defective Inflators, but it failed to even notify consumers of the dangers they face or take any other action to protect the driving public.

---

[8] *Id*. at 5.
[9] Letter from S. Gold, Vice President – Product Integrity, ARC, to S. Ridella, Director, Office of Defects Investigation, NHTSA (May 11, 2023), attached as Exhibit B.
[10] *Id*. at 1.

6.    NHTSA's conclusions followed a nearly eight-year investigation. During that time, there have been at least 10 known ruptures of the Defective Inflators in vehicles, including seven driver inflators and three passenger inflators. Two of those ruptures resulted in driver fatalities. Additionally, numerous Defective Inflators ruptured during ARC's internal testing. These ruptures led to recalls of a fraction of the Class Vehicles with the defect. Those recalls are inadequate in scope because tens of millions of vehicles with the Defective Inflators still have not been recalled. Between 2017 and 2022, for example, BMW, Ford, GM, and Volkswagen (defined *infra*) collectively recalled fewer than 6,400 vehicles equipped with airbags containing Defective Inflators.

7.    On or about May 10, 2023, after NHTSA issued its April 27, 2023, letter, GM initiated a broader, yet still inadequate, recall of 994,000 of GM's "2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles." Contrary to NHTSA's findings that there is a design defect, GM said it was recalling these vehicles because of "a supplier manufacturing defect [that] may result in rupture during deployment." Nonetheless, GM agreed that "[a]n inflator rupture may cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants."[11]

---

[11] General Motors, LLC Part 573 Safety Recall Report, submitted May 10, 2023, NHTSA Recall No. 23V-334, Manufacturer Recall No. N232404980, available at

*Footnote continued on next page.*

8.     On information and belief, ARC worked with others to conceal the Defective Inflators for years. It had help from the "Airbag Module Suppliers" (defined *infra*) and the "Vehicle Manufacturers" (defined *infra*). The Airbag Module Suppliers and Vehicle Manufacturers have long known that ARC inflators are defective. The Vehicle Manufacturers designate the specifications for the airbag inflators in their vehicles, which forbid structural failure and state that the inflators "shall not fail."

9.     Both the Airbag Module Suppliers and the Vehicle Manufacturers develop design specifications for the ARC inflators and require that ARC conduct testing and evaluations as part of the Production Part Approval Process ("PPAP"), which is the process that documents ARC's conformance to Vehicle Manufacturers' specifications. The Airbag Module Suppliers and Vehicle Manufacturers also require testing of the ARC inflators and, if the inflator does not meet the specifications, the Airbag Module Suppliers and Vehicle Manufacturers must grant an exception before the product is installed and sold. If there is an inflator failure, whether during testing or in the field, the Airbag Module Suppliers and Vehicle Manufacturers review all the previous design, process, and testing documents to determine the root cause of the failure.

---

https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V334-3594.PDF (last accessed June 13, 2023).

10.     Inflators and airbag modules are manufactured in groups that are known as "lots." Prior to installing a lot of inflators or airbag modules, the Vehicle Manufacturers require that ARC perform Lot Acceptance Testing ("LAT") on both inflators and airbag modules and that they be notified of any inflator ruptures. The Vehicle Manufacturers also run their own tests on the airbag modules.[12] The Airbag Module Suppliers and Vehicle Manufacturers were made aware of multiple LAT failures where the inflator ruptured during testing, as confirmed in several of the recalls. The Airbag Module Suppliers and Vehicle Manufacturers were also made aware of ARC inflator ruptures in the field. Even though they knew about the defect, the Vehicle Manufacturers still chose to sell tens of millions of vehicles with Defective Inflators to Plaintiffs and the Class Members.

11.     Vehicle Manufacturers have taken a lot-based recall approach to date. In a lot-based recall, Vehicle Manufacturers identify the lot of a failed inflator and then issue a recall notice for this finite population of inflators. A Vehicle Manufacturer "assumes" the defect was caused by a lot-specific manufacturing error rather than by a fleet-wide design defect and then waits until the next failure takes

---

[12] *See, e.g.*, https://static.nhtsa.gov/odi/inv/2016/INRL-EA16003-87413P.pdf (Ford requires ARC to "conduct Lot Acceptance Testing, Conformance of Production, or other production part testing to ensure conformance to design and performance requirements and/or quality control standards prior to shipping the components.").

*Footnote continued on next page.*

place before it issues further recalls.[13]

12.  NHTSA's correspondence confirms that ARC was regularly in touch with the Vehicle Manufacturers and Airbag Module Suppliers throughout NHTSA's investigation of the Defective Inflators. ARC, the Vehicle Manufacturers, and Airbag Module Suppliers continued to profit from the sale, service, and use of the Defective Inflators, while the Class bore the safety risk and related economic loss.

13.  On May 31, 2023, NHTSA issued a Special Order to ARC (1) outlining its investigative efforts and ARC's refusal to issue a recall, (2) requiring ARC to file answers to questions under oath, and (3) requiring ARC to produce certain documents by June 14, 2023.[14] NHTSA's Special Order seeks information that ARC has yet to provide NHTSA or its customers, including whether ARC contends that its airbag inflators are expected to occasionally experience a field rupture, the estimated number and frequency of field ruptures ARC expects to occur, and whether ARC has notified its customers that its inflators are expected to occasionally

---

[13] Several Vehicle Manufacturers took a similar lot-based recall approach early in the *In re Takata Airbag Products Liability Litigation*, MDL No. 2599. Eventually all the Vehicle Manufacturers in that case were required to recall all vehicles with the defective inflators because NHTSA found it was a dangerous design defect that affected all vehicles with the inflators. Not coincidentally, the defective Takata inflators – like the ARC inflators here – sometimes exploded and spewed sharp metal fragments into the faces and necks of drivers and passengers when their air bags deployed in a crash.

[14] Special Order Directed to ARC, *In re: EA 16-003 Air Bag Inflator Rupture* (NHTSA May 31, 2023), attached as Exhibit C.

*Footnote continued on next page.*

experience field ruptures.

14.     On June 14, 2023, ARC responded to NHTSA's Special Order under oath.[15] Among other things, ARC admitted that it "designs its inflators, manufacturing processes, and quality controls to operate within the manufacturing and performance parameters specified by its customers," *i.e.*, the Vehicle Manufacturers and Airbag Module Suppliers. ARC admitted that it did not have any expectation that the inflators at issue "would occasionally experience a field rupture."

15.     ARC also admitted that it has not taken any measures to notify its customers or consumers of the danger related to their inflators outside of the processes already embodied by the Advance Product Quality Process ("APQP"). ARC also confirmed that its customers participate in the design of the inflators and validation of the inflators in a process known as the Design Failure Mode and Effects Analysis ("DFMEA"). ARC confirmed that these customers required ARC to meet their own "specifications and quality requirements." The DFMEA includes a Process Failure Mode and Effects Analysis ("PFMEA"), "which evaluates each process step" and ultimately subscribes a Risk Priority Number ("RPN") to the relevant failure modes. ARC's customers have the right to review or audit each of these processes and make their own determination of whether the inflators are satisfactory.

---

[15] ARC's Written Response to May 31, 2023 Special Order, *In re: EA 16-003 Air Bag Inflator Rupture* (NHTSA June 14, 2023), attached as Exhibit D.

16.     ARC also confirmed that for ruptures that occur during testing, ARC notified the Airbag Module Suppliers and vice versa. ARC further confirmed that it was not able to estimate the number of field ruptures it expects to occur at this time.

17.     NHTSA specifically asked ARC to state the number of inflators that it had rejected due to "weld flash." ARC confirmed that, as late as 2016, it was not checking for weld flash issues with a borescope and, therefore, it does not know how many inflators were rejected for this reason. ARC did provide the numbers to NHTSA for weld flash rejections from August 2017 to May 31, 2023, but that information was stored on a drive and submitted as confidential. Therefore, the Class does not yet have that information.

18.     These answers confirm that the defect in ARC inflators is one of design, not a one-off manufacturing defect and, just as ARC, that Class Members would not reasonably expect the defect to occur. They also confirm that the Automaker and Airbag Module Suppliers were aware of the relevant rupture rate involved in the design process with ARC, such that they have responsibility for the defects alleged herein.

19.     Plaintiffs seek to accomplish what ARC refuses to do, even when confronted by NHTSA. Plaintiffs seek to remove the dangerous Defective Inflators off the road and install airbags with demonstrably safe inflators in the Class Vehicles, enjoin Defendant from further jeopardizing the lives of tens of millions of Class

Members, and compensate Plaintiffs and Class Members for the economic damage they have incurred from buying cars with defective safety systems.

20.     The Class is a nationwide class that includes "all consumers in the United States who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018."[16] The Class does not include: (a) ARC and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class Counsel; and (e) any person who timely and properly excludes himself or herself from the Class.

21.     In addition, the named Plaintiffs in this and the other transferred actions referenced herein bring claims under the laws of their respective states. These State Subclasses consist of "all consumers in their state of residence who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018." The State Subclasses do not include: (a) ARC and its board members, executive-level officers, attorneys,

---

[16] At this early stage and without the benefit of discovery, Plaintiffs cannot determine with certainty each vehicle by make, model, and model year equipped with the Defective Inflators but have included those about which they are reasonably confident. Plaintiffs may amend their pleadings to add vehicles if they are identified in the discovery process.

and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class Counsel; and (e) any person who timely and properly excludes himself or herself from the Class.

22.     Consistent with Federal Rule of Civil Procedure 23(c)(5), which sanctions the creation of subclasses "[w]hen appropriate," Plaintiffs reserve their right to modify the Class and the State Subclasses as discovery progresses and at the class certification stage.

23.     As NHTSA explained, instead of protecting Class Members during a crash, the Defective Inflators may explode, sending shrapnel into the passenger compartment and injuring or killing occupants. Class Members were not aware of the defect when they purchased or leased their Class Vehicles. Therefore, they overpaid for their Class Vehicles. The Defective Inflators also significantly diminished, and will continue to diminish, the value of the Class Vehicles. Worse yet, Class Members now face Hobson's choice: continue to drive their Class Vehicles and face the risk of catastrophic injury or replace the airbag modules containing Defective Inflators out of their own pockets.

24.     Plaintiffs, on behalf of themselves and all others similarly situated, assert nationwide and state claims and seek all available damages, penalties, and punitive damages for ARC's egregious conduct. Plaintiffs also seek declaratory and

injunctive relief, including a Court order directing ARC to expeditiously repair the Class Vehicles with demonstrably safe airbags.

## II.    PARTIES, JURISDICTION, AND VENUE

### A.    The Defendant

25.    At all relevant times, as alleged below, Defendant herein was authorized to (and did) conduct business within each state and territory of the United States and supplied its products to Class Members in said states and territories. Defendant received financial benefit and profits as a result of designing, manufacturing, testing, marketing, distributing, importing, and selling Defective Inflators, either directly or through a subsidiary or agent, within each state and territory of the United States. Additionally, no Plaintiff relinquishes the right to amend his or her individual claims to include additional claims as discovery proceeds and facts and other circumstances may warrant, pursuant to the appropriate Federal Rules of Civil Procedure or a subsequent order.

### 1.    Defendant ARC

26.    Defendant ARC is a Delaware corporation, headquartered at 1729 Midpark Road, Suite 100, Knoxville, Tennessee 37921. It has manufacturing facilities in Morgantown, Kentucky, and Hartsville, Tennessee, among others around the United States and the world. ARC manufactures a full complement of airbag inflators and related parts. ARC's factory in Knoxville, Tennessee, is one of the three American factories maintained by ARC. This factory assembles and tests ARC

products for distribution around the country and Tennessee, including some of the Defective Inflators at issue in this case.

27.     At all times alleged herein, ARC was authorized to conduct and did engage in substantial business within each state and territory of the United States and supplied products within them, including the state of Tennessee, such that it should anticipate being haled into Court there. On information and belief, ARC maintains contractual relationships with the Airbag Module Suppliers and the Vehicle Manufacturers to supply component parts with the intent they be installed and sold in Class Vehicles, which the Vehicle Manufacturers sell through networks of dealerships in each state and territory of the United States, including Tennessee.

28.     ARC delivers its products into the stream of commerce from Tennessee with the expectation that they will be purchased by consumers in all of the United States, purposefully avails itself of the laws of each state and territory of the United States, and receives financial benefit and profits as a result of designing, manufacturing, testing, marketing, distributing, storing, and/or selling the Defective Inflators, either directly or through subsidiaries within each state and territory of the United States. As such, the claims in this case arise out of or relate to ARC's contacts with Tennessee. Thus, ARC has afforded itself the protection of Tennessee laws, and committed the tortious acts alleged in this Complaint in whole or in part in the state of Tennessee from its headquarters.

29.     Therefore, jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America, and the Tennessee Long Arm Statute, Tenn. Stat. § 20-2-201. This Court may exercise both general and specific personal jurisdiction over ARC because such jurisdiction is proper in the transferor Court, the Western District of Tennessee. ARC can be served through its registered agent, The Corporation Trust Company, 1209 Orange Street, Corporation Trust Center, Wilmington, Delaware 19801.

## B.     Relevant Entities

### 1.     The "Airbag Module Suppliers"

#### a.     Autoliv

30.     AUTOLIV, INC. is incorporated in Delaware and maintains its principal place of business in Sweden. AUTOLIV, INC., created, operates, and substantially controls AUTOLIV ASP, INC., which develops, designs, tests, markets, promotes, and distributes Autoliv-brand automotive component parts and passive safety systems, including the airbag modules at issue in this lawsuit, throughout the United States, including Tennessee. Although AUTOLIV, INC., is headquartered in Sweden, it is a publicly traded company listed on the New York Stock Exchange and publicly represents that its "corporate governance is subject primarily U.S. federal and state regulations . . ." This is the Company's "primary listing," meaning that it has chosen to subject itself to the corporate governance laws of the United States.

31.     AUTOLIV ASP, INC., was formed under the laws of Indiana and maintains its principal places of business in Ogden, Utah, and Auburn Hills, Michigan. AUTOLIV ASP, INC., operates five manufacturing facilities in Utah. The Utah and Michigan facilities both design, manufacture, test, market, and sell airbag modules and components, including inflators and propellant. AUTOLIV ASP, INC., also operates two Autoliv Technical Centers in the United States that help develop, design, and test airbag modules and their components for various vehicle platforms. AUTOLIV, INC., and AUTOLIV ASP, INC., are collectively referred to as the "Autoliv."

### b.     Joyson

32.     Joyson Safety Systems ("Joyson") is incorporated under the laws of Delaware and maintains its principal place of business in Michigan and has offices in Sunnyvale, California. Joyson develops, designs, tests, markets, promotes, and manufactures airbag modules and inflators for, and distributes and sells them to, the Vehicle Manufacturers, including the airbag modules at issue in this lawsuit, throughout the United States, including Michigan and California. Joyson and its predecessor companies, including Key Safety Systems, Inc., have repeatedly used the Port of Savannah, Georgia, to transport and facilitate the distribution of its component parts including airbag inflators and airbag inflator modules.

### c.    Toyoda Gosei

33.     Toyoda Gosei North America, Inc., ("Toyoda Gosei") is incorporated under the laws of Michigan and has its principal place of business in Michigan. Toyoda Gosei incorporates ARC inflators into airbag modules for use in vehicles manufactured by one or more Vehicle Manufacturers.

### d.    ZF

34.     ZF are ZF Active Safety and Electronics US LLC; ZF Passive Safety Systems US Inc.; ZF Automotive US Inc.; ZF TRW Automotive Holdings Corp.; and ZF Friedrichshafen AG. Plaintiffs refer to these entities collectively as the "ZF." Plaintiffs refer to ZF Active Safety and Electronics US LLC, ZF Passive Safety Systems US Inc., ZF Automotive US Inc., ZF TRW Automotive Holdings Corp. as the "Domestic ZF Entities."

35.     ZF Active Safety and Electronics US LLC (referred to herein as "ZF Electronics USA") is a Delaware LLC headquartered in Michigan. It formerly operated under the name "TRW Automotive U.S. LLC." ZF Electronics USA designed, manufactured, and sold some airbag modules that incorporated ARC's Defective Inflators.

36.     ZF Passive Safety Systems US Inc. (referred to herein as "ZF Passive Safety USA") is a Delaware corporation headquartered in Michigan. It previously operated under the name "TRW Vehicle Safety Systems, Inc." ZF Passive Safety

USA worked closely with ZF Electronics USA to design the airbag modules that incorporate ARC's Defective Inflators. During the relevant period, it issued paychecks to the vast majority of the ZF engineers and technical specialists who were responsible for the core design of the relevant airbag modules, the adaptation of those modules to the various makes and models of the Class Vehicles, and the investigation of Defective Inflators.

37. ZF Automotive US Inc. (referred to herein as "ZF Automotive USA") is a Delaware corporation headquartered in Michigan and the direct parent and 100% owner of ZF Passive Safety USA and ZF Active Safety and Electronics US LLC. It formerly operated under the name "TRW Automotive Inc." It shares responsibility with ZF Electronics USA for the design and manufacture of the airbag modules at issue in this case.

38. ZF TRW Automotive Holdings Corp. (referred to herein as "ZF TRW Corp.") is a Delaware Corporation headquartered in Michigan and the direct parent and 100% owner of ZF Automotive USA. ZF TRW Corp. is also the entity that contracted with several vehicle manufacturers on behalf of itself and all its subsidiaries.[17] ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive

---

[17] Some of these contracts predated the existence of ZF TRW Corp. and were signed by TRW Inc., its corporate predecessor. In 2004, ZF TRW Corp. assumed substantially all of TRW Inc.'s contractual obligations and other liabilities relating to TRW Inc.'s automotive business, when ZF TRW Corp. spun out from a privately owned company.

USA designed, made, and sold the relevant airbag modules pursuant to these ZF TRW Corp. contracts.

### 2. The "Vehicle Manufacturers"

#### a. BMW

39.    BMW Manufacturing Co. ("BMW Mfg.") is a Limited Liability Company organized under the laws of the state of Delaware with its principal place of business in Spartanburg, South Carolina. BMW Mfg. designs, manufactures, assembles, and tests BMW brand cars in South Carolina. BMW Mfg. markets, promotes, advertises, distributes, and sells BMW brand cars, trucks, and sport utility vehicles in each state and territory of the United States, including South Carolina. BMW Mfg. manufactured all X series BMW vehicles.

40.    BMW of North America, LLC ("BMW America") was formed under the laws of Delaware and maintains its principal place of business in New Jersey. BMW America is a distributorship headquartered at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. BMW America, a New Jersey limited liability company, is registered to do business in the state of South Carolina. BMW America imports, promotes, advertises, distributes, and sells BMW AG and/or BMW brand cars, trucks, and sport utility vehicles in the United States.

41.    Bayerische Motoren Werke ("BMW AG") is incorporated under the laws of Germany and maintains its principal place of business in Germany.

42. BMW AG, BMW Mfg., and BMW America are collectively referred to as "BMW."

**b. FCA**

43. FCA US LLC, a/k/a Fiat Chrysler Automobiles US (hereinafter referred to as "FCA"), is a limited liability company formed under the laws of Delaware and its principal place of business is 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA is a citizen of Delaware and Michigan. FCA acquired the companies previously known as Chrysler Group, LLC, and Chrysler LLC. As a result of those acquisitions, FCA is the successor-in-interest to the liabilities of the companies it acquired. FCA and its predecessors design, manufacture, assemble, test, market, promote, advertise, distribute and/or sell Chrysler, Dodge, and Jeep branch vehicles in each state and territory of the United States, including Michigan.

**c. Ford**

44. Ford Motor Company ("Ford") is incorporated under the laws of Delaware and maintains its principal place of business at One American Road, Dearborn, Michigan 48126. Ford develops, manufactures, distributes, sells, and/or services Ford brand cars and trucks in each state and territory of the United States, including Michigan, where it maintains its principal place of business.

**d. GM LLC**

45. General Motors LLC ("GM LLC"), f/k/a General Motors Company, is

organized under Delaware law and maintains its principal executive offices at 300 Renaissance Center, Detroit, Michigan 48243. At all times, including and after October 16, 2009, GM LLC has been the operating entity that manufactures, markets, and sells GM brand cars and trucks in each state and territory of the United States.

46.     Prior to October 16, 2009, GM LLC was known as General Motors Company. For all relevant purposes, prior to 2009 General Motors Company or its predecessors-in-interest were the operating entities that manufactured, marketed, and sold GM brand cars and trucks in the United States. By virtue of a series of corporate transactions, General Motors Company ultimately became GM LLC. GM LLC also became the successor-in-interest to the liabilities of General Motors Company and its corporate predecessors for purposes of this lawsuit.

### e.     Hyundai-Kia

47.     Hyundai Motor Group ("HMG") is a general partnership composed of, *inter alia*, Hyundai Motor Company, Kia Corporation, and Hyundai Mobis Co., Ltd. (*see infra*). HMG is incorporated under the laws of South Korea and maintains its principal place of business in South Korea. Under the name of HMG, the "Hyundai-Kia," discussed below, frequently act jointly to advance the interest of all of selling

cars in the United States.[18]

48.    Hyundai America Inc. ("Hyundai America") is incorporated in California and has its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92728. Hyundai America manufactures, designs, and distributes new vehicles under the Hyundai brand. Hyundai America also markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles throughout the United States, including from its headquarters in California. Hyundai America can be served through its registered agent for service, Jae Won Kim of 101 W Mulberry Boulevard, Suite 130, Pooler, Georgia 31407.

49.    Hyundai Motor Company is incorporated under the laws of South Korea and maintains its principal place of business in South Korea.

50.    HMG is incorporated under the laws of South Korea and maintains its principal place of business in South Korea.

51.    Kia America, Inc., ("Kia America") is incorporated and headquartered in California. Its principal place of business is located at 111 Peters Canyon Road, Irvine, California. Kia America manufactures and distributes new vehicles under the Kia brand. Kia America also markets, leases, warrants, and oversees regulatory

---

[18] *See* https://www.autonews.com/article/20171214/RETAIL03/312159994/hyundai-ad-firm-buys-kia-s-longtime-u-s-agency (noting ad agency merge in the United States that ultimately would jointly promote Kia and Hyundai automobiles by, for example, running super bowl ads).

compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States from its headquarters in California and into all of the United States. Kia America can be served through its registered agent, The Corporation Company, 106 Colony Park Drive Ste. 800-B, Cumming, Georgia 30040.

52.    Kia Corporation is incorporated under the laws of South Korea and maintains its principal place of business in Seoul, South Korea. It is South Korea's second largest automobile manufacturer, after its sister company, Hyundai Motor Company.

53.    Kia America is a subsidiary of Kia Corporation, which is a part of Hyundai Motor Group. Hyundai Motor Company, Hyundai America's parent company, is the largest investor in Kia Corporation. On its official websites and in press releases, Hyundai Motor Group has referred to the companies as the "Hyundai Kia Automotive Group," and lists their United States manufacturing, research, and sales facilities as part of that group. Collectively, all Hyundai and Kia entities are referred to as the "Hyundai-Kia."

54.    Hyundai Mobis Co., Ltd. is incorporated under the laws of South Korea and maintains its principal place of business in South Korea. Hyundai Mobis is an Airbag Module Supplier that sells airbags and occupant restraint system components for inclusion in automobiles sold and distributed in the United States. Hyundai

Mobis Co., Ltd., is an affiliated company of Hyundai Motor Co., with each company owning a significant portion of the other's shares. Hyundai Mobis Co., Ltd., is the sole owner of Mobis Parts America, LLC, which Hyundai Mobis Co., LTD., created and operates to promote its business interests within the United States.

### f.  Porsche

55.   Dr. Ing. H.C. Porsche AG ("Porsche AG") is incorporated under the laws of Germany and maintains its principal place of business in Germany.

56.   Porsche Cars North America, Inc. ("Porsche America") is incorporated under the laws of Delaware and maintains its principal place of business at One Porsche Drive, Atlanta, GA. 30354. Porsche AG wholly owns Porsche America. Porsche AG and Porsche America are referred to collectively as "Porsche." Porsche America is the importer and distributor of Porsche brand vehicles sold in the United States. Porsche vehicles sold in the United States contain Defective Inflators manufactured by the ARC Defendants.

### g.  Volkswagen

57.   Volkswagen Aktiengesellschaft ("Volkswagen AG") is incorporated under the laws of Germany and maintains its principal place of business in Germany.

58.   Audi Aktiengesellschaft ("Audi AG") is incorporated under the laws of Germany and maintains its principal place of business in Germany.

59.   Audi of America, LLC ("Audi America") is a Delaware limited liability

company and maintains its principal place of business in Virginia. Audi AG and Audi America are referred to collectively as "Audi." Audi America is the importer and distributor of Audi brand vehicles sold in the United States. Audi vehicles sold in the United States contain Defective Inflators manufactured by ARC.

60.     Volkswagen AG is the parent company of VW America. Together these entities operate under the name "Volkswagen Group" and jointly actively cultivates a market for, designs, develops, manufactures, and/or sells Volkswagen and Audi automobiles and the replacement component parts for these vehicles, such as replacement ARC inflators, in each state and territory of the United States, including New Jersey.

61.     Volkswagen Group of America, Inc., d/b/a Audi of America, Inc. ("VW America") is a corporation organized under the laws of the state of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. VW America engages in business activities which include the advertising, marketing, and sale of VW automobiles nationwide. VW America is registered as an active business in California and Virginia. VW America "houses the U.S. operations of a worldwide family of distinguished and exciting brands including Audi, Bentley, Bugatti, Lamborghini and Volkswagen, as well as VW Credit, Inc. . . ."

62.     Collectively the Volkswagen Group is referred to herein as the

"Volkswagen." Volkswagen operates 120 production facilities worldwide. Eight of the facilities are located in California, including an Electronics Research Lab & Design Center in Belmont, California; a Technical Center in Oxnard, California; and a Volkswagen/Porsche/Audi Training Center in Eastvale, California. The Volkswagen/Audi/VCI Western Region is headquartered in Woodland Hills, California.

### C. The Plaintiffs

63. Plaintiff David Anderson resides in Troy, Pennsylvania. Plaintiff owns a 2016 Ford F-150, which he purchased used in 2022 in Mansfield, Pennsylvania. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would

have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

64. Plaintiff Robert Ballero Gonzalez resides in Elmont, New York. Plaintiff owns a 2016 Dodge Challenger, which he purchased new in 2016 from South Shore Chrysler Dodge Jeep Ram in New York, an authorized Dodge dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Dodge's advertisements, promotional materials and other public statements, Plaintiff was aware of Dodge's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Dodge's uniform and pervasive marketing message, that he

would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Dodge disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Dodge in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

65.    Plaintiff Deneen Brown resides in Advance, North Carolina. Plaintiff owns a 2014 Kia Forte LX, which she purchased new in 2013 from Randy Marion Kia in Salisbury, North Carolina, an authorized Kia dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's

advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

66. Plaintiff Jonathan M. Carano resides in Canton, Michigan. Plaintiff

owns a 2010 Kia Rio, which he purchased for approximately $10,000 used in 2013 from Village Ford in Dearborn, Michigan. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Kia's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased

the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

67. Plaintiff Dennis Fett resides in Toleca, Illinois. Plaintiff owns a 2016 Jeep Cherokee, which he purchased used on or about May 2019 from Roanoke Motors in Roanoke, Illinois, an authorized Jeep dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Jeep's advertisements, promotional materials and other public statements, Plaintiff was aware of Jeep's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Jeep's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Jeep disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly

before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Jeep in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

68.     Plaintiff Clayton Fineout resides in Baldwin, Michigan. Plaintiff owns a 2011 Chevrolet Silverado 1500, which he purchased used in 2019 from Burt Watson Chevrolet Cadillac in Freeland, Michigan, an authorized Chevrolet dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was

equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

69.     Plaintiff Bonnie Florentine resides in Orland Park, Illinois. Plaintiff owns a 2016 Cadillac ATS, which she purchased used in 2017 from Arnie Bauer Cadillac in Matteson, Illinois, an authorized Cadillac dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Cadillac's advertisements, promotional materials and other public statements, Plaintiff was aware of Cadillac's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class

Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Cadillac's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Cadillac disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Cadillac in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

70.     Plaintiff Ninotchka Harpey-Bey resides in Las Vegas, Nevada. Plaintiff owns a 2012 Chevrolet Malibu, which she purchased used in 2016 from Carmax in Las Vegas, Nevada. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect.

Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

71.     Plaintiff Mark Hartman resides in St. Louis, Missouri. Plaintiff owns a 2016 Ford F-150, which he purchased used for about $25,000 on or about December 2016 from Kunes Chevrolet in Morrison, IL. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If

Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

72.     Plaintiff Michael Hayes resides in Myrtle Beach, South Carolina. Plaintiff owns a 2014 Chevrolet Silverado 1500, which he purchased new on or about September 2014 from Myrtle Beach Chevrolet in Myrtle Beach, South Carolina, an authorized Chevrolet dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he

purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

73.     Plaintiff Brad Hoschar resides in Pittsburgh, Pennsylvania. Plaintiff owns a 2012 Kia Sportage, which he purchased used in 2017 from Jim Shorkey Kia in Irwin, Pennsylvania, an authorized Kia dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Kia's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before

Plaintiff purchased his Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

74.     Plaintiff Steve Isbister resides in Pickerington, Ohio. Plaintiff owns a 2015 Cadillac SRX, which he purchased used in 2019 from Carmax in Ohio. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Cadillac's advertisements, promotional materials and other public statements, Plaintiff was aware of Cadillac's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the

Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

75. Plaintiff Brandy Knapp resides in Kalispell, Montana. Plaintiff owns a 2019 Volkswagen Jetta, which she purchased used in 2021 in Kalispell, Montana at Kalispell Volkswagen, an authorized Volkswagen dealership. Plaintiff's Class

Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Volkswagen's advertisements, promotional materials and other public statements, Plaintiff was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Volkswagen's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Volkswagen disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Volkswagen in the future if

Defendants' representations about the vehicle, including its safety and durability, were accurate.

76.     Plaintiff Renee Lesesne resides in Cross, South Carolina. Plaintiff owns a 2007 Chevrolet Equinox, which she purchased used in 2016 in Summerville, South Carolina. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective

Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

77. Plaintiff Rene Madueno resides in Adelanto, California. Plaintiff owns a 2016 Dodge Charger SE, which she purchased new in 2016 from Victorville Motors in Victorville, California, an authorized Dodge dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Dodge's advertisements, promotional materials and other public statements, Plaintiff was aware of Dodge's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Dodge's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Dodge disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the

defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Dodge in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

78.    Plaintiff James McCrory resides in Laurel, Mississippi. Plaintiff owns a 2017 Hyundai Elantra, which he purchased new on or about July 2017 from Eastern Shore Hyundai in Alabama, an authorized Hyundai dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Hyundai's advertisements, promotional materials and other public statements, Plaintiff was aware of Hyundai's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Hyundai's uniform and pervasive marketing message, that he would be in a safe and dependable

vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Hyundai disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Hyundai in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

79.     Plaintiff Janice McKennon resides in Springlake, North Carolina. Plaintiff owns a 2017 Chevrolet Equinox, which she purchased used on or about May 2020 from Carmax in North Carolina. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform

and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

80.    Plaintiff Loretta Mitchell resides in Hartford, Connecticut. Plaintiff owns a 2016 Ford Mustang, which she purchased used on or about November 2022

from Carvana in Connecticut. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Ford's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did she disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a

vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

81. Plaintiff Bryan Polo resides in Richmond, Virginia. Plaintiff owns a 2009 Chevrolet Silverado 1500 which he purchased used in 2017 in Richmond, Virginia. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective

Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

82.     Plaintiff Steven Aula resides in Royal Oak, Michigan. Plaintiff owns a 2010 Chevrolet Equinox, which he purchased new in approximately June 2010. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no

way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

83.     Plaintiff Ryan Clark resides in Mount Pleasant, South Carolina. Plaintiff owns a 2015 BMW X5, which he purchased used in South Carolina in approximately November 2019. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to BMW's advertisements, promotional materials and other public statements, Plaintiff was aware of BMW's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on BMW's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not

marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did BMW disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from BMW in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

84.    Plaintiff Latricia Ford resides in Goose Creek, South Carolina. Plaintiff owns a 2008 Kia Sportage, which she purchased used in 2018 in South Carolina. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are

safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

85. Plaintiff Sheila Hall-Hudson resides in Memphis, Tennessee. Plaintiff owns a 2007 Chevrolet Tahoe, which she purchased used in approximately 2011 in Tennessee. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff

purchased her Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle,

including its safety and durability, were accurate.

86.     Plaintiff Rosalind Hudson-Battie resides in Decatur, Georgia. Plaintiff owns a 2005 Chevrolet Avalanche, which she purchased used in approximately 2013 in Georgia. Plaintiff also owns a 2005 GMC Yukon which she purchased used in approximately 2012 in Georgia. Plaintiff's vehicles were covered by a written warranty. Plaintiff purchased her Class Vehicles without knowledge of the Inflator Defect. Through her exposure to Chevrolet and GMC's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet and GMC's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicles. When Plaintiff acquired the Class Vehicles, she believed, based on Chevrolet and GM's uniform and pervasive marketing message, that she would be in safe and dependable vehicles, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet and GMC disclose that they were not safe or dependable, or that they were equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicles that they contained airbags with Defective Inflators and only recently learned of the presence of the Inflator Defect in her Class Vehicles in 2022, shortly before commencing her lawsuit. To Plaintiff's

knowledge, the airbags with the Defective Inflators in her Class Vehicles have not been repaired or replaced. The value of Plaintiff's vehicles has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicles, or would have paid less to do so. Plaintiff would purchase a vehicle from Chevrolet and GMC in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

87. Plaintiff Hannah Jones resides in Des Moines, Iowa. Plaintiff owns a 2011 Kia Sportage, which she purchased used from Carmax in Iowa in 2014. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect,

Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

88.    Plaintiff Aaron Jophlin resides in Pawley's Island, South Carolina. Plaintiff owns a 2015 GMC Acadia, which he purchased new in approximately 2015 in South Carolina. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GMC's advertisements, promotional materials and other public statements, Plaintiff was aware of GMC's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GMC's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not

marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GMC disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff would purchase a vehicle from GMC in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

89.    Plaintiff Tyler Baker resides in Underhill, Vermont. Plaintiff owns a 2015 Kia Forte, which he purchased used on or about October 27, 2020 for approximately $10,500 from Berlin City Kia of Vermont in Williston, Vermont, an authorized Kia dealership. Plaintiff's 2015 Kia Forte was covered by a written warranty. Through his exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive

marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Kia's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when they purchased their Class Vehicle that it contained the airbags with defective ARC inflators and only recently learned of the presence of the Inflator Defect in their Class Vehicle May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Baker would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including safety and durability, were accurate.

90. Plaintiff Anthony Wayne Brown resides in Rio Linda, California. Plaintiff owns a 2014 Chevrolet Traverse, which he purchased used on or about

February 1, 2020 for approximately $14,000 from Future Chevrolet in Sacramento, California. Plaintiff's 2014 Chevrolet Traverse was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. Although Plaintiff received a recall notice from GM on or about May 10, 2023, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of

Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Brown would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

91.     Plaintiff Vincent Cerrato, Jr. resides in Williston, South Carolina. Plaintiff owns a 2016 Ford F-150, which he purchased new on or about May 1, 2017 for approximately $47,000 from Essential Ford in Stuart, Florida, an authorized Ford dealership. Plaintiff's 2016 Ford F-150 was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff

had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Cerrato would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

92.     Plaintiff William Arthur Guest, Jr. resides in Villa Park, Illinois. Plaintiff owns a 2016 Chevrolet Equinox, which he purchased new on or about March 1, 2016 for approximately $36,000 from Sunrise Chevrolet in Glendale Heights, Illinois, an authorized Chevrolet dealership. Plaintiff's 2016 Chevrolet Equinox was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and

pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Guest would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

93.    Plaintiff Nicole Hearn resides in Cherokee, Alabama. Plaintiff owns a 2016 Chevrolet Cruze, which she purchased used on or about March 19, 2021 for approximately $16,000 from Uftring Weston Chevrolet in Peoria, Illinois, an authorized Chevrolet dealership. Plaintiff's 2016 Chevrolet Cruze was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the

Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Hearn would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

94.     Plaintiff Jimmy Herrera resides in Boca Raton, Florida. Plaintiff owns a 2016 Ford Mustang, which he purchased used on or about December 1, 2020 for approximately $37,000 from Gunther Volkswagen in Delray Beach, Florida. Plaintiff's 2016 Ford Mustang was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has

been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Herrera would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

95. Plaintiff Carla Taylor Long resides in Cherokee, Alabama. Plaintiff owns a 2014 Kia Sportage, which she purchased used on or about December 1, 2018 for approximately $15,000 from Greenway Kia of Shoals in Sheffield, Alabama, an authorized Kia dealership. Plaintiff's 2014 Kia Sportage was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been

aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Long would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

96.     Plaintiff Tracy Miles resides in Cordora, Alabama. Plaintiff owns a 2013 Hyundai Elantra, which she purchased used on or about December 1, 2021 for approximately $7,000 from Waldrop Motors in Jasper, Alabama. Plaintiff's 2013 Hyundai Elantra was covered by a written warranty. Plaintiff her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Hyundai advertisements, promotional materials and other public statements, Plaintiff was aware of Hyundai's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Hyundai's uniform and pervasive marketing message, that she would be in a safe and

dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Hyundai disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Miles would purchase a vehicle from Hyundai in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

97.     Plaintiff Doug Phillip Paulson resides in Caldwell, Idaho. Plaintiff owns a 2016 Chevrolet Impala, which he purchased new on or about May 1, 2016 for approximately $32,000 from Platinum Chevrolet in Santa Rosa, California, an authorized Chevrolet dealer. Plaintiff's 2016 Chevrolet Impala was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the

Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Paulson would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

98.     Plaintiff Patricia Taylor resides in Cherokee, Alabama. Plaintiff owns a 2010 Hyundai Elantra, which she purchased used on or about April 1, 2012 for approximately $22,000 from Superior Hyundai in Anniston, Alabama, an authorized Hyundai dealership. Plaintiff's 2010 Hyundai Elantra was covered by a written warranty. Plaintiff her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Hyundai advertisements, promotional materials and other public statements, Plaintiff was aware of Hyundai's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Hyundai's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Hyundai disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or

replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Taylor would purchase a vehicle from Hyundai in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

99.     Plaintiff Jordan E. Tribble resides in Kennesaw, Georgia. Plaintiff owns a 2014 Kia Sportage, which she purchased used on or about September 2, 2021 for approximately $4,000 from the original owner who purchased the vehicle new from Cobb County Kia, now Jim Ellis Kia of Kennesaw. Plaintiff's 2014 Kia Sportage was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would

have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in September 2022, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Tribble would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

100. Plaintiff Anita Victory resides in North Little Rock, Arkansas. Plaintiff owns a 2011 Kia Sportage, which she purchased used on or about August 6, 2020 for approximately $5,000 from Macon Trading Center in North Little Rock, Arkansas. Plaintiff's 2011 Kia Sportage was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and pervasive marketing message, that she would be in a

safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Victory would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

101. Plaintiff Julie Walling resides in Alton, Illinois. Plaintiff owns a 2014 Chevrolet Impala, which she purchased new on or about January 1, 2014, for approximately $30,000 from Granite City Chevrolet in Granite City, Illinois, an authorized Chevrolet dealership. Plaintiff's 2014 Chevrolet Impala was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the

Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Walling would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

102. Plaintiff David Winslow resides in Angelus Oaks, California. Plaintiff owns a 2015 Chevrolet Trax, which he purchased used on or about July 1, 2022 for approximately $15,000 from Hyundai of Anaheim in Anaheim, California. Plaintiff's 2015 Chevrolet Trax was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in May 2023, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been

diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Winslow would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

103.    Plaintiff John Britton resides in Burlingame, California. Plaintiff owns a 2016 Ford F-150 from the Ford Store Morgan Hill in Morgan Hill, California on July 22, 2016 for approximately $34,694.00 and a 2017 Ford F-150 which he bought on August 26, 2017 for approximately $46,411.80 from Bill Brand Ford in Brentwood, California, both authorized Ford dealerships. Both Plaintiff's F-150s were covered by written warranties. Plaintiff John Britton purchased his Class Vehicles without knowledge of their Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective

Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased their Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in 2022, shortly before commencing their lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicles, or would have paid less to do so. Plaintiff John Britton would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

104.    Plaintiff Celeste Felice resides in Gibsonton, Florida. Plaintiff owns a 2016 GMC Acadia, which she purchased used on or about December 21, 2021 for approximately $28,106.50 from Brandon Mitsubishi in Tampa, Florida, an authorized GMC dealership. Plaintiff's GMC Acadia was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GMC advertisements, promotional materials and other public statements, Plaintiff was aware of GMC's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class

Vehicle, she believed, based on GMC's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GMC disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2022, shortly before commencing her lawsuit. Although GMC sent notice to Plaintiff on or about May 10, 2023, the notice GMC sent did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Celeste Felice would purchase a vehicle from GMC in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

105. Plaintiff Stephen Gearhart resides in Fort Myers Beach, Florida. Plaintiff owns a 2017 Porsche Macan GTS, which he purchased used on or about

December 11, 2019 for approximately $59,000 from Porsche Fort Myers in Fort Myers, Florida, an authorized Porsche dealership. Plaintiff's Porsche was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Porsche's advertisements, promotional materials and other public statements, Plaintiff was aware of Porsche's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Porsche's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Porsche disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not

purchased the Class Vehicle, or would have paid less to do so. Plaintiff Stephen Gearhart would purchase a vehicle from Porsche in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

106. Plaintiff Eniko Gedo resides in Bensenville, Illinois. Plaintiff owns a 2017 Volkswagen Golf, which she purchased new on or about October 28, 2017 for approximately $23,776.00 from Larry Roesch Volkswagen of Bensenville in Bensenville, Illinois, an authorized Volkswagen dealership. Plaintiff's Volkswagen Golf was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Volkswagen's advertisements, promotional materials and other public statements, Plaintiff was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Volkswagen's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Volkswagen disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an

airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Eniko Gedo would purchase a vehicle from Volkswagen in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

107.   Plaintiff Eva Jacinto resides in Los Angeles, California. Plaintiff owns a 2016 Audi A3, which she purchased used on or about June 26, 2018 for approximately $23,780.52 from Desert European Motorcars in Rancho Mirage, California, an authorized Audi dealership. Plaintiff's Audi A3 was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Audi's advertisements, promotional materials and other public statements, Plaintiff was aware of Audi's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Audi's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a

vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Audi disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Eva Jacinto would purchase a vehicle from Audi in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

108. Plaintiff Patricia Jones resides in Brandon, Florida. Plaintiff owns a 2019 Volkswagen GTI, which she purchased new on or about February 16, 2019 for approximately $29,276.83 from Volkswagen Brandon in Tampa, Florida, an authorized Volkswagen dealership. Plaintiff's Volkswagen GTI was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Volkswagen's advertisements, promotional

materials and other public statements, Plaintiff was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Volkswagen's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Volkswagen disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Patricia Jones would purchase a vehicle from Volkswagen in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

109. Plaintiff Matthew Kakol resides in Massapequa Park, New York.

Plaintiff owns 2017 Ford Mustang, which he purchased new on or about August 7, 2017 for approximately $27,677.00 from Levittown Ford in Levittown, New York, an authorized Ford dealership. Plaintiff's Ford Mustang was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If

Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Matthew Kakol would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

110. Plaintiff Francine Lewis resides in Deer Park, New York. Plaintiff leases a 2019 Volkswagen Jetta which she leased new on or about November 9, 2019 from Smithtown Volkswagen in Saint James, New York, an authorized Volkswagen dealership. Plaintiff's Volkswagen Jetta was covered by a written warranty. Plaintiff leased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Volkswagen's advertisements, promotional materials and other public statements, Plaintiff was aware of Volkswagen's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to lease the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Volkswagen's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff leased her Class Vehicle did Volkswagen disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she leased her Class Vehicle that

it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not leased the vehicle, or would have paid less to do so. Plaintiff Francine Lewis would lease a vehicle from Volkswagen in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate. NOTE: Francine Lewis then purchased the vehicle off the lease in October 2022 AFTER being filed as a plaintiff in Britton case in NDCA.

111.  Plaintiff Kristen Luiz resides in Rutland, Massachusetts. Plaintiff owns a 2015 BMW X5, which she purchased used on or about August 29, 2017 for approximately $39,517.06 from Wagner BMW of Shrewsbury in Shrewsbury, Massachusetts, an authorized BMW dealership. Plaintiff's BMW X5 was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to BMW's advertisements, promotional materials and other public statements, Plaintiff was aware of BMW's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the

Class Vehicle, she believed, based on BMW's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did BMW disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Kristen Luiz would purchase a vehicle from BMW in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

112. Plaintiff Rittie Marshall resides in Memphis, Tennessee. Plaintiff owns a 2007 Cadillac Escalade, which she purchased which she purchased used on or about March 21, 2017 from Bud Davis Cadillac in Memphis, Tennessee, an authorized Cadillac dealership. Plaintiff's 2007 Cadillac Escalade was covered by a

written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Cadillac's advertisements, promotional materials and other public statements, Plaintiff was aware of Cadillac's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Cadillac's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Cadillac disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Rittie Marshall would purchase a vehicle from Cadillac in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

113.   Plaintiff Anthony Raspantini resides in Brick, New Jersey. Plaintiff owns a 2015 Ford F-150, which he purchased used on or about May 5, 2018 for approximately $42,850.00 from All American Ford in Point Pleasant, New Jersey, an authorized Ford dealership. Plaintiff's Ford F-150 was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when Ford purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of

Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Anthony Raspantini would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

114. Plaintiff Nicole Senkpeil resides in Orland Park, Illinois. Plaintiff owns a 2014 Chevrolet Traverse which she purchased used on or about June 19, 2017 for approximately $22,687.24 from Apple Chevrolet in Tinley Park, Illinois, an authorized Chevrolet dealership. Plaintiff's Chevrolet Traverse was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would

have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2022, shortly before commencing her lawsuit. Although GM sent notice to Plaintiff on or about May 10, 2023, the notice GM sent did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Nicole Senkpeil would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

115. Plaintiff Shona Thomas resides in Maywood, Illinois. Plaintiff owns a 2012 Hyundai Elantra, which she purchased new on or about June 2012 from Happy Hyundai in Oak Lawn, Illinois, an authorized Hyundai dealership. Plaintiff's Hyundai Elantra was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Hyundai's advertisements, promotional materials and other public statements, Plaintiff was aware of Hyundai's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the

Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Hyundai uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Hyundai disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Shona Thomas would purchase a vehicle from Hyundai in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

116.   Plaintiff Melissa Warren resides in Palos Hills, Illinois. Plaintiff owns a 2017 Chevrolet Traverse, which she purchased new on or about November 16, 2016 for approximately $35,434 from Advantage Chevrolet in Hodgkins, Illinois, an

authorized Chevrolet dealership. Plaintiff's Chevrolet Traverse was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2022, shortly before commencing her lawsuit. Although Chevrolet sent a notice on or about May 10, 2023, the notice sent to Plaintiff did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known

about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Melissa Warren would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

117.  Plaintiff Marie Hudson resides in Chicago, Illinois. Plaintiff owns a 2014 Kia Forte, which she purchased new on or about May 31, 2014 for approximately $25,000 from Napleton Kia River Oak in Calumet City, Illinois, an authorized Kia dealership. Plaintiff's 2014 Kia Forte was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle

that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Marie Hudson would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

118. Plaintiff Leigh Schultz resides in Albert City, Iowa. Plaintiff owns a 2006 Chevrolet Silverado 3500, which she purchased used on or about October 2016 from Macke Motors, Inc. in Lake City, Iowa, an authorized Chevrolet dealership. Plaintiff's 2006 Chevrolet Silverado 3500 was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a

vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Leigh Schultz would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

119. Plaintiff Billy Sellers resides in Loris, South Carolina. Plaintiff owns a 2015 Ford F150, which he purchased used on or about February 28, 2019 from Bennettsville Ford in Bennettsville, South Carolina, an authorized Ford dealership. Plaintiff's 2015 Ford F150 was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Ford's advertisements, promotional materials and other public statements, Plaintiff

was aware of Ford's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Ford's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Ford disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Billy Sellers would purchase a vehicle from Ford in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

120. Plaintiff Matthew Shephard resides in Greenville, Pennsylvania. Plaintiff owns a 2015 GMC Acadia, which he purchased used on or about May 2021

from Montrose GMC in Hermitage, Pennsylvania, an authorized GMC dealership. Plaintiff's 2015 GMC Acadia was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GMC's advertisements, promotional materials and other public statements, Plaintiff was aware of GMC's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GMC's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GMC disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his vehicle in 2023, shortly before commencing his lawsuit. Although GMC sent a notice to Plaintiff on or about May 10, 2023, the notice GMC sent did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If

Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Matthew Shephard would purchase a vehicle from GMC in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

121.    Plaintiff Bobby Sims resides in Meridian, Mississippi. Plaintiff owns a 2014 Chevrolet Equinox, which he purchased new on or about September 12, 2014 from an authorized Chevrolet dealership in Mississippi. Plaintiff's 2014 Chevrolet Equinox was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an

airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Bobby Sims would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

122. Plaintiff Brenda Smith-Watson resides in Chesapeake, Virginia. Plaintiff owns a 2013 Hyundai Elantra, which she purchased new on or about January 16, 2013 from Hall Hyundai in Chesapeake, Virginia, an authorized Hyundai dealership. Plaintiff's 2013 Hyundai Elantra was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Hyundai's advertisements, promotional materials and other public statements, Plaintiff was aware of Hyundai's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Hyundai's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Hyundai disclose that it was not safe or dependable,

or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Brenda Smith-Watson would purchase a vehicle from Hyundai in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

123.   Plaintiff Latasha Tinch resides in Albany, Georgia. Plaintiff owns a 2017 Dodge Challenger, which she purchased used on or about March 4, 2020 from an authorized Dodge dealership in Georgia. Plaintiff's 2017 Dodge Challenger was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Dodge's advertisements, promotional materials and other public statements, Plaintiff was aware of Dodge's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff

acquired the Class Vehicle, she believed, based on Dodge's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Dodge disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Latasha Tinch would purchase a vehicle from Dodge in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

124.    Plaintiff Michael Tropea resides in Lawrence, Massachusetts. Plaintiff owns a 2017 Chevrolet Cruze, which he purchased new on or about December 3, 2016 for approximately $18,876 from Quirk Chevrolet in Braintree, Massachusetts, an authorized Chevrolet dealership. Plaintiff's 2017 Chevrolet Cruze was covered

by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Michael Tropea would purchase a vehicle from Chevrolet in the future if Defendants'

representations about the vehicle, including its safety and durability, were accurate.

125. Plaintiff Elizabeth Valenzuela resides in Apache Junction, Arizona. Plaintiff owns a 2013 Chevrolet Silverado 1500, which she purchased used in or about 2016 from Larry H. Miller Dodge in Avondale, Arizona. Plaintiff's 2013 Chevrolet Silverado 1500 was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class

Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Elizabeth Valenzuela would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

126.   Plaintiff George Welch resides in Maywood, Illinois. Plaintiff owns a 2017 GMC Acadia, which he purchased used on or about November 19, 2020 from Castle Buick GMC of North Riverside in North Riverside, Illinois, an authorized GMC dealership. Plaintiff's 2017 GMC Acadia was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GMC's advertisements, promotional materials and other public statements, Plaintiff was aware of GMC's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GMC's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GMC disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their

knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff George Welch would purchase a vehicle from GMC in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

127.    Plaintiff Theresa Wolle resides in Clarksville, Tennessee. Plaintiff owns a 2016 Kia Forte, which she purchased new on or about January 11, 2016 from Wyatt Johnson Kia in Clarksville, Tennessee, an authorized Kia dealership. Plaintiff's 2016 Kia Forte was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Kia's uniform and

pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Theresa Wolle would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

128. Plaintiff Kenneth Allan resides in Kenosha, Wisconsin. Plaintiff owns a 2016 Buick Enclave, which he purchased new on or about December 13, 2015 for approximately $48,000.00 from Boucher Buick GMC in Brookfield, Wisconsin, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator

Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Kenneth Allan would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

129.     Plaintiff Moises Alonso resides in Birmingham, Alabama. Plaintiff owns a 2017 GMC Sierra 2500, which he purchased new on or about May 1, 2017 for approximately $96,000 from Courtesy Birmingham GMC in Birmingham, Alabama, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of

Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Moises Alonso would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

130.    Plaintiff Dave Bacon resides in Aberdeen, South Dakota. Plaintiff owns a 2018 GMC Sierra 1500, which he purchased new on or about October 1, 2017 for approximately $50,000 from Steven Lust Automotive in Aberdeen, South Dakota. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when

he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Dave Bacon would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

131. Plaintiff Leatha Barber resides in Greenup, Kentucky. Plaintiff owns a 2014 Buick Enclave, which she purchased used on or about November 1, 2020 for approximately $14,000 from Glockenspiel Chevy Used Cars in Ashland, Kentucky. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and

dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Leatha Barber would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

132.   Plaintiff Brandon Barker resides in Buffalo, New York. Plaintiff owns a 2015 Chevrolet Silverado 1500, which he purchased used on or about February 30, 2020 for approximately $28,000 from Keller Chevrolet in Buffalo, New York, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and

other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Brandon Barker would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

133. Plaintiff Brian Belanger resides in Lowell, Massachusetts. Plaintiff

owns a 2016 Chevrolet Silverado 1500, which he purchased new on or about August 25, 2016 for approximately $43,971 from Chevrolet of Lowell in Lowell, Massachusetts, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If

Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Brian Belanger would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

134.   Plaintiff Rached Belhadj resides in Tampa, Florida. Plaintiff owns a 2012 Cadillac SRX, which he purchased used on or about October 13, 2015 for approximately $24,606 from Park Place Motorcars Mercedes in Dallas, Texas. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator

and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Rached Belhadj would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

135. Plaintiff Lisamarie Blumberg resides in Wilmington, Delaware. Plaintiff owns a 2013 GMC Acadia, which she purchased used on or about December 19, 2020 for approximately $16,000 from Matt Slap Subaru in Newark, Delaware. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM

disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Lisamarie Blumberg would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

136. Plaintiff Tina Brown resides in Beacon, New York. Plaintiff owns a 2012 GMC Yukon, which she purchased new on or about July 26, 2015 from an authorized GM dealership in the Bronx, New York. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable,

which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Tina Brown would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

137. Plaintiff Christopher Carter resides in Mesa, Arizona. Plaintiff owns a 2014 GMC Yukon, which he purchased new on or about October 16, 2014 for approximately $33,097 from Bill Luke Tempe Fiat in Tempe, Arizona, an authorized

GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Christopher Carter would purchase a vehicle from GM in the

future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

138. Plaintiff Katrina Chambliss resides in Virginia Beach, Virginia. Plaintiff owns a 2012 Buick Enclave, which she purchased used on or about August 15, 2020 for approximately $11,000 from United Auto Wholesalers in Portsmouth, Virginia. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To

Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Katrina Chambliss would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

139.  Plaintiff Corby Cline resides in Deland, Florida. Plaintiff owns a 2015 GMC Sierra 1500, which he purchased used on or about October 17, 2017 for approximately $43,025 from Ben Mynatt Chevrolet in Concord, North Carolina, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped

with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Corby Cline would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

140.   Plaintiff William Demele resides in Spanaway, Washington. Plaintiff owns a 2010 Chevrolet Silverado 1500, which he purchased used on or about January 1, 2016 for approximately $21,000 from Titus Will Chevrolet in Tacoma, Washington, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was

material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff William Demele would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

141. Plaintiff Marcos Diaz resides in Tujunga, California. Plaintiff owns a 2015 GMC Acadia, which he purchased used on or about May 18, 2020 for approximately $18,000 from West Covina Auto Exchange in West Covina,

California. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his vehicle in 2023, shortly before commencing his lawsuit. Although Plaintiff received a notice from GM in June 2023, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would

have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Marcos Diaz would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

142. Plaintiff Manakia Eiland resides in Louisville, Mississippi. Plaintiff owns a 2017 GMC Acadia, which she purchased used on or about December 2, 2020 for approximately $19,995 from Carmax in Jackson, Mississippi. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle

in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Manakia Eiland would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

143. Plaintiff Gregorio Escobedo resides in Palmdale, California. Plaintiff owns a 2016 GMC Sierra 1500, which he purchased new on or about August 21, 2016 for approximately $53,013 from Diamond Buick GMC in Palmdale, California, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or

that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Gregorio Escobedo would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

144. Plaintiff Jamaria Fernandez resides in Courtland, Virginia. Plaintiff owns a 2011 GMC Acadia, which she purchased used on or about June 1, 2016 for approximately $27,000.00 from Carbiz in Baltimore, Maryland. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle.

When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Jamaria Fernandez would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

145. Plaintiff Harley Graff resides in Warrensburg, Missouri. Plaintiff owns a 2014 Chevrolet Silverado 2500, which she purchased used on or about July 22, 2020 for approximately $5,400.00 from Fruendly Auto Source in Moscow Mills, Missouri. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff

purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Harley Graff would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability,

were accurate.

146. Plaintiff Douglas Hall resides in Indianapolis, Indiana. Plaintiff owns a 2013 Chevrolet Silverado LT 1500, which he purchased used on or about November 1, 2014 for approximately $37,900.00 from Keyser Auto in Marion, Illinois. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced.

The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Douglas Hall would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

147.    Plaintiff Westley Hamner resides in Gulf Shores, Alabama. Plaintiff owns a 2011 Cadillac SRX, which he purchased used on or about March 21, 2023 for approximately $10,000.00 from Next Owner Automotive in Tuscaloosa, Alabama. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had

no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Westley Hamner would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

148.   Plaintiff Natasha Hochstetler resides in Oakdale, Minnesota. Plaintiff owns a 2010 GMC Sierra 1500, which she purchased used on or about December 19, 2016 for approximately $20,000.00 from AutoNation Ford White Bear Lake in White Bear Lake, Minnesota. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message,

that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Natasha Hochstetler would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

149. Plaintiff Stacey Kabir resides in Mobile, Alabama. Plaintiff owns a 2017 GMC Sierra 1500, which she purchased new on or about April 17, 2017 for approximately $54,000.00 from McConnell Buick GMC in Mobile, Alabama, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator

Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Stacey Kabir would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

150. Plaintiff John Komoroski resides in Oxford, Connecticut. Plaintiff owns a 2015 Chevrolet Silverado 1500, which he purchased used on or about January 15, 2020 for approximately $25,999.00 from Jim Juliani Motors in Waterbury, Connecticut. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of

Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff John Komoroski would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

151.   Plaintiff Tiffany Marvin resides in Olympia, Washington. Plaintiff owns a 2010 GMC Yukon Denali, which she purchased used on or about January 18, 2016 for approximately $18,900.00 from Titus Will Chevrolet Buick GMC in Olympia, Washington, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would

have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Tiffany Marvin would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

152. Plaintiff Daniel McCarthy resides in Lake Hopatcong, New Jersey. Plaintiff owns a 2011 Chevrolet Silverado 1500, which he purchased new in 2011 for approximately $39,355.00 from Gearhart Chevrolet in Denville, New Jersey, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he

would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Daniel McCarthy would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

153. Plaintiff Latunder Mercadel resides in Lithonia, Georgia. Plaintiff leased then purchased a 2011 Cadillac SRX, which she began leasing on or about June 5, 2020 from Lara's Trucks in Duluth, Georgia. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff leased then purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's

advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to lease and purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff leased or purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she leased or purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not leased or purchased the vehicle or would have paid less to do so. Plaintiff Latunder Mercadel would lease or purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

154. Plaintiff Scott Milewski resides in Brighton, Michigan. Plaintiff owns a 2009 GMC Sierra, which was willed to him in 2016 from Steubenville, Ohio. Plaintiff retained possession of his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to retain possession of the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff retained possession of his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he retained possession of his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would

have not retained possession of the vehicle or would have paid less to do so. Plaintiff Scott Milewski would own a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

155.   Plaintiff Felicia Owens resides in Bolivar, Tennessee. Plaintiff owns a 2008 GMC Acadia, which she purchased used in or around June 2021 for approximately $1,000 in a private sale in Millington, Tennessee. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle

in 2023, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Felicia Owens would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

156. Plaintiff Kara Petschen resides in St. Cloud, Minnesota. Plaintiff owns a 2008 GMC Yukon, which she purchased used on or about December 10, 2018 for approximately $12,999 from Midstate Auto Sales in Foley, Minnesota. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective

Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2023, shortly before commencing her lawsuit. Although Plaintiff received a notice from GM, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Kara Petschen would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

157. Plaintiff Anita Reddick resides in Decatur, Georgia. Plaintiff owns a 2015 Chevrolet Silverado 1500, which she purchased used in or around June 2017 for approximately $25,500 from Sons Kia in McDonough, Georgia. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe

and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased their Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2023, shortly before commencing her lawsuit. Although Plaintiff received a notice from GM in or around May 2023, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Anita Reddick would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

158. Plaintiff Jeffrey Rhoades resides in Brighton, Michigan. Plaintiff owns

a 2016 Chevrolet Silverado 1500, which he purchased used on or about January 23, 2016 for approximately $41,743 from Feldman Chevrolet in New Hudson, Michigan, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If

Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Jeffrey Rhoades would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

159.   Plaintiff Jeffrey Slusher resides in Leavenworth, Kansas. Plaintiff owns a 2015 Chevrolet Silverado 1500, which he purchased used on or about June 12, 2018 for approximately $29,930 from Hendrick Chevrolet in Merriam, Kansas, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased their Class Vehicle that it

contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his vehicle in 2023, shortly before commencing his lawsuit. Although Plaintiff received a notice from GM, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Jeffrey Slusher would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

160.  Plaintiff Chad Sorenson resides in Spokane, Washington. Plaintiff owns a 2007 GMC Sierra Denali, which he purchased used on or about August 22, 2018 for approximately $18,928.50 from Dave Smith CDA in Coeur d'Alene, Idaho. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's

uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased their Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his vehicle in 2023, shortly before commencing his lawsuit. Although Plaintiff received a notice from GM, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Chad Sorenson would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

161. Plaintiff Tonjua Speck resides in Upland, California. Plaintiff owns a 2011 GMC Sierra, which she purchased new in or around 2011 for approximately $38,000 from Reynold's GMC Buick of Covina in West Covina, California, an

authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased their Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2023, shortly before commencing her lawsuit. Although Plaintiff received a notice from GM on or about June 16, 2023, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator

Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Tonjua Speck would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

162. Plaintiff Gilbert Starkey resides in Las Vegas, Nevada. Plaintiff owns a 2019 GMC Acadia, which he purchased new on or about March 9, 2019 for approximately $55,315.67 from Fairway Buick GMC Truck in Las Vegas, Nevada, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it

contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Gilbert Starkey would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

163.    Plaintiff Dwayne Stowe resides in McDonough, Georgia. Plaintiff owns a 2017 GMC Acadia, which he purchased used on or about October 29, 2017 for approximately $30,000 from Hennessy Buick GMC in Morrow, Georgia, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not

marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Dwayne Stowe would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

164.   Plaintiff Julie Struble resides in Rye, New Hampshire. Plaintiff owns a 2014 GMC Acadia, which she leased and then purchased new on or about June 23, 2014 for approximately $45,475 from Holloway Buick GMC in Portsmouth, New Hampshire, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff leased and purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to GM's advertisements,

promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on GM's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff leased and purchased her Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she leased and purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2023, shortly before commencing her lawsuit. Although Plaintiff received a notice from GM on or about May 11, 2023, the notice Plaintiff received did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not leased and purchased the vehicle or would have paid less to do so. Plaintiff Julie Struble would lease and purchase a vehicle from GM in the future if Defendants' representations

about the vehicle, including its safety and durability, were accurate.

165. Plaintiff Frank Talavera resides in South San Francisco, California. Plaintiff owns a 2011 Cadillac SRX, which he purchased used on or about January 20, 2021 for approximately $12,000 from Stewart Chevrolet in Colma, California, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective

Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Frank Talavera would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

166.   Plaintiff Michael Thomas resides in Albany, Georgia. Plaintiff owns a 2014 Cadillac SRX, which he purchased used on or about July 20, 2020 for approximately $19,432.97 from Carmax Auto Superstores, Inc. in Warner Robins, Georgia. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the

Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Michael Thomas would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

167. Plaintiff Nelson Yerger resides in Clarkesville, Georgia. Plaintiff owns a 2015 GMC Sierra, which he purchased new in or around July 2015 for approximately $48,000 from Vaden GMC in Beaufort, South Carolina, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed,

based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Nelson Yerger would purchase a vehicle from GM in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

168. Plaintiff Jaime Duran resides in Las Vegas, Nevada. Plaintiff owns a 2013 Chevrolet Silverado 1500, which he purchased used on or about May 10, 2016 for approximately $32,000.00 from Champion Dodge in Las Vegas, Nevada, an authorized GM dealership. Plaintiff's Class Vehicle was covered by a written

warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GM's advertisements, promotional materials and other public statements, Plaintiff was aware of GM's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GM's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GM disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Jaime Duran would purchase a vehicle from GM in the future if Defendants' representations about the

vehicle, including its safety and durability, were accurate.

169. Plaintiff Preshawn Long resides in Orange County, Florida. Plaintiff owns a 2004 Dodge Caravan, which she purchased used on or about April 7, 2021 in Jefferson County, Alabama. Plaintiff's 2004 Dodge Caravan was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Dodge's advertisements, promotional materials and other public statements, Plaintiff was aware of Dodge's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Dodge's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Dodge disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced.

The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Preshawn Long would purchase a vehicle from Dodge in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

170. Plaintiff Daniel McCarthy resides in Lake Hopatcong, New Jersey. Plaintiff owns a 2011 Chevrolet Silverado 1500, which he purchased new on or about December 31, 2011 from Schumacher Chevrolet of Denville (f/k/a Gearhart Chevrolet) in Denville, New Jersey, an authorized Chevrolet dealership. Plaintiff's 2011 Chevrolet Silverado 1500 was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet's disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed

their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Daniel McCarthy would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

171.   Plaintiff Elisabeth Lovett resides in Murfreesboro, Tennessee. Plaintiff owns a 2015 Buick Enclave, which she purchased used on or about March 25, 2021 from Russell Barnett Ford in Tullahoma, Tennessee. Plaintiff's 2015 Buick Enclave was covered by a written warranty. Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Buick's advertisements, promotional materials and other public statements, Plaintiff was aware of Buick's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Buick's uniform and pervasive

marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Buick's disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her vehicle in 2022, shortly before commencing her lawsuit. Although Buick sent notice on or about May 10, 2023, the notice Buick sent to Plaintiff did not disclose the true nature of the Inflator Defect. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Elisabeth Lovett would purchase a vehicle from Buick in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

172. Plaintiff Patricia Mobley resides in Georgetown, South Carolina. Plaintiff owns a 2011 Chevrolet Malibu, which she purchased used on or about July 20, 2020. Plaintiff's 2011 Chevrolet Malibu was covered by a written warranty.

Plaintiff purchased her Class Vehicle without knowledge of the Inflator Defect. Through her exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to her decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, she believed, based on Chevrolet's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased her Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when she purchased her Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in her Class Vehicle in 2022, shortly before commencing her lawsuit. To Plaintiff's knowledge, the airbags with the Defective Inflators in her Class Vehicle have not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Patricia Mobley would purchase a vehicle from Chevrolet in the future if Defendants'

representations about the vehicle, including its safety and durability, were accurate.

173. Plaintiff Ryan Taylor resides in Memphis Tennessee. Plaintiff owns a 2011 GMC Sierra, which he purchased used on or about September 3, 2013 from Autonation GMC Memphis in Memphis, Tennessee, an authorized GMC dealership. Plaintiff's 2011 GMC Sierra was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GMC's advertisements, promotional materials and other public statements, Plaintiff was aware of GMC's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GMC's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GMC disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been

repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Ryan Taylor would purchase a vehicle from GMC in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

174.    Plaintiff Richard Topa resides in Johnson City, New York. Plaintiff owns a 2006 Kia Sportage, which he purchased used on or about February 26, 2017 from Country Club Kia in Oneonta, New York, an authorized Kia dealership. Plaintiff's 2006 Kia Sportage was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Kia's advertisements, promotional materials and other public statements, Plaintiff was aware of Kia's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Kia's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Kia disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff

would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Richard Topa would purchase a vehicle from Kia in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

175. Plaintiffs Bobbie White and Trois White reside in Marshall County, Alabama. Plaintiffs own a 2007 Saturn Outlook, which they purchased used on or about April 6, 2015 in Boaz, Alabama. Plaintiffs' 2007 Saturn Outlook was covered by a written warranty. Plaintiffs purchased their Class Vehicle without knowledge of the Inflator Defect. Through their exposure to Saturn's advertisements, promotional materials and other public statements, Plaintiffs were aware of Saturn's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to their decision to purchase the Class Vehicle. When Plaintiffs acquired the Class Vehicle, they believed, based on Saturn's uniform and pervasive marketing message, that they would be in a safe and dependable vehicle, one that is safer than

a vehicle that is not marketed as safe and dependable. At no point before Plaintiffs purchased their Class Vehicle did Saturn disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiffs would have heard, seen, and been aware of it. Plaintiffs had no way of knowing when they purchased their Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in their Class Vehicle in 2022, shortly before commencing their lawsuit. To Plaintiffs' knowledge, the airbags with the Defective Inflators in their Class Vehicle have not been repaired or replaced. The value of Plaintiffs' vehicle has been diminished as a result of the Inflator Defect. If Plaintiffs had known about the Inflator Defect, they either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiffs Bobbie White and Trois White would purchase a vehicle from Saturn in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

176.   Plaintiff Earl Wilson resides in Bronx, New York. Plaintiff owns a 2005 GMC Envoy, which he purchased used on or about January 17, 2011 for approximately $13,000 in New York, New York. Plaintiff's 2005 GMC Envoy was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to GMC's advertisements,

promotional materials and other public statements, Plaintiff was aware of GMC's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on GMC's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did GMC disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Earl Wilson would purchase a vehicle from GMC in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

177. Plaintiff Ronald Wolf resides in Johns Island, South Carolina. Plaintiff

owns a 2013 Chevrolet Silverado, which he purchased used on or about August 11, 2019 from Malouf Cadillac-Chevrolet in North Brunswick, New Jersey, an authorized Chevrolet dealership. Plaintiff's Chevrolet Silverado was covered by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Chevrolet's advertisements, promotional materials and other public statements, Plaintiff was aware of Chevrolet's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Chevrolet's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Chevrolet disclose that it was not safe or dependable, or that it was equipped with an airbag containing a Defective Inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained an airbag with a Defective Inflator and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2022, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbag with the Defective Inflator in his Class Vehicle has not been repaired or replaced. The value of Plaintiff's Class Vehicle has been diminished as a result of the Inflator

Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the Class Vehicle, or would have paid less to do so. Plaintiff Ronald Wolf would purchase a vehicle from Chevrolet in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

### D.     Jurisdiction and Venue

178.    Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendant's home state, there are more than 100 putative Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Also, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

179.    The Court has personal jurisdiction over the Plaintiffs because some reside in this District and all others submit to the jurisdiction of this Court.

180.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a)-(c). A substantial part of the events or omissions giving rise to these claims occurred in this District. ARC does substantial business in Tennessee and within this District, and maintains requisite minimum contacts with Tennessee.  Furthermore, venue is proper in this District because, like many other class members, significant and material aspects of the transactions relating to Plaintiff's purchase and/or service of their Class Vehicles occurred within and were otherwise connected to this District.

Defendants are residents of this District under 28 U.S.C. 1391(c)(2) because they are subject to personal jurisdiction in this District.

## III. FACTUAL ALLEGATIONS

### A. ARC's History

181. ARC has a long history of developing pyrotechnic propellants for use in rocket motors and airbag inflators, among other products. The company was formed in 1949 under the name Atlantic Research Corporation, with the aim of developing propellants for the U.S. Department of Defense.[19]

182. ARC first supplied propellant for passenger-side airbag inflators in 1970 and developed its first hybrid passenger inflators as part of a joint venture with Allied Signal in 1993.[20] Today, Defendant ARC is a global manufacturer that produces a full complement of inflators for automotive airbag applications (driver, side, head, knee, seat, seatbelt, and curtain).

183. ARC has factories all over the world, including in Knoxville, Morgantown, and Hartsville, Tennessee; Xi'an and Ningbo, China; and Skoplje, Macedonia.[21]

184. Of the 67 million Defective Inflators at issue in this action, ARC designed and manufactured nearly all of them. Though ARC claims that Delphi (now

---

[19] About Us, ARC, http://www.arcautomotive.com/about.html (last accessed June 28, 2023).
[20] *Id.*
[21] ARC's plant in Reynosa, Mexico, is in the process of shutting down.

owned by Autoliv, *see supra* ¶¶ 30-36) manufactured 11 million of the Defective Inflators, the inflators manufactured by Delphi were likely manufactured to ARC's specifications and include a label identifying both ARC and Delphi as the manufacturers.[22]

### B.     The Airbag Supply Chain

185.   In the automotive industry, ARC is known as a "Tier 2 supplier," meaning it supplied the Defective Inflators, and other automotive components, to the Airbag Module Suppliers. The Airbag Module Suppliers are known as "Tier 1 suppliers" and include Autoliv, Joyson, Toyoda Gosei, TRW, and Hyundai Mobis. The Airbag Module Suppliers supplied completed airbag modules to the Vehicle Manufacturers, *i.e.*, major auto manufacturers and distributors, who incorporated the modules into the completed Class Vehicles, which they manufactured, distributed, marketed, and sold.

186.   ARC, the Airbag Module Suppliers, and the Vehicle Manufacturers shared information and worked together throughout the design, manufacturing, assembly and investigation process using the APQP process, in which the suppliers and customers communicate during every step of design and testing.[23] For example,

---

[22] *See*, *e.g.*,
https://www.ebay.com/itm/125918786116?epid=1022168909&hash=item1d51583244%3Ag%3AymQAAOSwFZ1kU5nz&fits=Year%3A2006%7CModel%3ASierra+1500%7CMake%3AGMC (last accessed June 12, 2023).

[23] *In re: EA16-003 Air Bag Inflator Rupture*, ARC's Written Response to May 31,

*Footnote continued on next page.*

the Vehicle Manufacturers supply the Airbag Module Suppliers with end product specifications of airbag modules that will fit into the Vehicle Manufacturers' vehicles as well as the ballistic and timing requirements the airbag inflators must meet.[24] These specifications consist of regulatory requirements and contractual performance requirements negotiated by the ARC, the Airbag Module Suppliers, and the Vehicle Manufacturers.

187.   After ARC develops the design for the inflator, it creates a DFMEA, which evaluates the potential failure modes that could occur with the inflator, such as overpressurization caused by various issues, and the possible effects that could result from those failures, such as rupture.[25] The DFMEA is used to identify the possible problems that could arise with the design and to evaluate whether certain aspect should be redesigned to address the most severe failure effects.[26] The DFMEA ranks each failure effect by the level of severity should it occur, with 10 being the highest severity; the likelihood the failure will occur; and the ability of the design controls to detect the failure mode before it occurs.[27] These rankings are used to calculate a RPN that assesses the overall design risk. When the severity ranking

---

2023 Special Order, at 6.

[24] *Id.*

[25] *Id.*

[26] Potential Failure Model and Effects Analysis (FMEA), 4th ed. 2008, at PDF 24.

[27] *Id.* at PDF 21.

*Footnote continued on next page.*

is high and when the RPN is high, engineers must implement corrective actions to ensure the failure mode does not occur.[28] Once the DFMEA is completed, the supplier creates a PFMEA that uses the same criteria to evaluate each step in the process to identify issues that could arise during the manufacturing process and creates a Control Plan to minimize the chance of these manufacturing errors occurring.[29]

188.   The DFMEA, PFMEA, and Control Plan are all reviewed by the Tier 1 suppliers and the Vehicle Manufacturer customers as part of the PPAP, which requires that the supplier provide documents showing that the inflator was designed, manufactured, and tested to meet the Tier 1 and Vehicle Manufacturers' requirements, prior to its approval for production. During this process, the Tier 1 and Vehicle Manufacturer participants review the RPN and inform the Tier 2 supplier if they believe the RPN is too high and requires a redesign to lower the risk.[30] ARC's response to NHTSA's Special Order confirms that the PPAP process was followed for the Defective Inflators.[31] Thus, the Defective Inflators' design and manufacture, including the use of friction welding without a process for inspecting the center support for weld flash, would have been reviewed by the Airbag Module Suppliers

---

[28] *Id.* at PDF 66-67.
[29] *In re: EA16-003 Air Bag Inflator Rupture*, ARC's Written Response to May 31, 2023 Special Order, at 6.
[30] *Id.*
[31] *Id.*

and the Vehicle Manufacturers and approved prior to their production, purchase, and installation.

189.   When a safety or performance issue arises with an automotive part, like the airbag module assembly, or one of its components, like the inflator, the Airbag Module Suppliers and Vehicle Manufacturers have the right and obligation to examine design and validation testing for all relevant components. In fact, on information and belief, the Vehicle Manufacturers have reserved this contractual right for themselves when dealing with Tier 1 and Tier 2 suppliers.

190.   In NHTSA's April 2023 letter to ARC and ARC's response, it is clear that ARC, the Vehicle Manufacturers, and Airbag Module Suppliers have been aware of and worked on the defect issues from the outset. For example, ARC admits that while the Vehicle Manufacturers are not ARC's direct "customers"; in this instance, some Vehicle Manufacturers have "worked directly with ARC during the course of NHTSA's investigation" into the failure of the Defective Inflators.

191.   Thus, at least by the time the ARC Defective Inflators began rupturing and NHTSA began investigating, the Vehicle Manufacturers had examined, or should have examined, all design and manufacturing documentation related to ARC's inflators. The Vehicle Manufacturers would have worked with both ARC and the Airbag Module Suppliers during these evaluations.

## C.    ARC's Airbag Inflators

192.    Airbags are a critical safety feature in every car sold in the United States since 1999. They are required by law and prevent serious injury and death during accidents. To effectively shield passengers from impact with the vehicle interior, airbags must deploy quickly. Thus, airbag systems use a carefully and precisely controlled explosion to rapidly inflate the airbag cushion upon collision. The explosive charge is typically created by a chemical propellant. The airbag inflator is a metal canister that houses the chemical propellant and controls its release. In a collision, the propellant generates gases to inflate the airbag cushion.

193.    The diagram below illustrates the basic components of the driver airbag system:



194.    ARC's Defective Inflators are found in both driver and passenger side airbags and are known as hybrid inflators. According to ARC, this technology uses

compressed gas "augmented by limited amounts of pyrotechnic material."[32] Hybrid inflators combine the use of a propellant and a quantity of stored pressurized inert gas to inflate the airbag cushion. In a crash, the inflator ignitor starts the chemical propellant reaction to produce a portion of the gas while stored pressurized gas, which expands due to the heat generated during the burning of the propellant, inflates the remainder of the cushion.

195.   ARC's Defective Inflators are all similarly "toroidal," or doughnut shaped, and structured for both driver and passenger side airbags. During the Class Period, ARC designated its driver hybrid toroidal inflators as CADH/DH-7 (single stage) and DCADH (dual stage). ARC designated its passenger inflators as PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage). The following is an illustration of ARC's typical driver's side inflator for the DCADH model:[33]



Dual Level CADH Hybrid Inflator

---

[32]Products, ARC, http://www.arcautomotive.com/products.html (last accessed June 5, 2023).

[33] ARC, Products, Dual Level CADH Hybrid Inflator (last accessed Apr. 21, 2022).

*Footnote continued on next page.*

196.   This design is substantially similar to a common ARC hybrid passenger side airbag inflator, the PH7 shown in the image below:[34]



197.   The following are actual images of an ARC hybrid driver inflator:



*Top*: *Top-down view of an ARC hybrid toroidal driver inflator.*

*Bottom*: *Cross sectional view of an ARC hybrid toroidal driver inflator.*

198.   The following photos show the back side of the driver inflator which is centrally located on the back of the airbag module assembly (the side facing away from the driver) for the 2013-2017 Chevrolet Traverse. The photo on the right shows that same inflator photo zoomed-in on the label that identifies it as an ARC DCADH-

---

[34] ARC, Products, Dual Level PH7 (120) Hybrid Inflator (last accessed Apr. 21, 2022).

*Footnote continued on next page.*

C inflator:[35]

 

199.   Below are photos of an ARC hybrid front passenger inflator identified as an ARC PH7 used in the 2015-2017 Audi A3.[36] The photo shows the similarity to the driver side inflator used in the GM vehicle models cited above.



---

[35] eBay, 2013-2014-2015-2016-2017 Chevrolet Traverse Driver Airbag (last accessed Apr. 21, 2022).
[36] Audi A3 Right Passenger Dash Bag, eBay.



200.   The inflators are attached to different airbag cushions, which are tailored to the size and shape needed for a driver or passenger module. For example, the image below is of the passenger side airbag in a 2015-2017 Audi A3 which was manufactured by Key Safety Systems (KSS), a predecessor of Joyson.[37]



201.   As noted, to function, an airbag needs the chemical propellant to create a controlled explosion. ARC has used ammonium nitrate as its propellant since at least 2001. Ammonium nitrate is a desirable propellant for Vehicle Manufacturer or part supplier because it affords a high percentage of gas in its combustion and is inexpensive. Ammonium nitrate is commonly used as a fertilizer and is well known for its use in making cheap explosives. Both NHTSA's own investigations, and a

---

[37] *Id.*

December 2015 version of ARC's Material Safety Data Sheet (MSDS) for its hybrid inflators, confirm as much.

202.   Because of its natural habit of changing shape and volume with temperature changes, ammonium nitrate is used in inflators only when it is precisely phase stabilized. Phase stabilized ammonium nitrate or "PSAN," suppresses volume changes that would otherwise occur with temperature cycling. In the face of an unexpected rise in pressure, such as a blocked ventilation exit orifice, PSAN burns exponentially faster than many other propellant chemicals.[38] PSAN's faster dynamic burning rate, or burning en masse, means that the gases can build up faster than the metal canister can handle if the ventilation exit orifices are inadequate or obstructed.

203.   Even though the causes of the ruptures were different in Takata's inflators, Takata's use of PSAN in its deadly airbag inflators focused the industry's attention on the potential for PSAN to be volatile. In 2019, ARC itself in a patent recognized that PSAN was "considered unacceptable" even in hermetically sealed hybrid inflators.[39] ARC, the Vehicle Manufacturers, and the Airbag Module

_____

[38] PSAN is considered overly risky and inappropriate by most in the scientific, research, safety, Automaker, and supplier manufacturing communities. Thus, most inflator manufacturers now use a variant of guanidine nitrate as the fuel in their propellant in frontal impact airbag designs. Guanidine nitrate has been proven over the last two decades to be a safe and durable propellant chemical. A small number of airbag propellant manufacturers have used ammonium nitrate due to cost savings.

[39] Patent US 2019/0218155 A1, Non-Ammonium Nitrate Based Generants, filed Jan. 17, 2019, publ. July 18, 2019, at 2.

Suppliers were aware of PSAN's risks and the explosive force that results from the speed of combustion. Thus, they knew that ARC's airbag inflator housing needed to, at least, incorporate features that mitigate against structural failure due to excessive pressure. Thus, the inflators must be designed with a sufficient number of ventilation exit orifices in correct locations such that they will not be blocked.

204.   Based on a review of recalls from 2000 to present involving inflator ruptures, whether in the manufacturing facilities or in the field, such ruptures are exceedingly rare in designs that do not contain ammonium nitrate in the propellant. The bottom line is that ARC designed its Defective Inflators using a highly explosive and unstable propellant that it knew was associated with dangerous ruptures under certain circumstances and required properly designed and engineered ventilation measures. Thus, ARC, the Vehicle Manufacturers, and Airbag Module Suppliers were aware and on notice that the inflators must be designed to withstand and avoid over pressurization of the inflator housing due to the presence of the propellant. This was a known mechanism of failure.

### D.     The Defect

205.   Against this background, all ARC's Defective Inflators had a serious design defect or defects: the presence of asymmetrical and unstable weld "flash" in the interior of the inflator housing combined with insufficient ventilation using a single exit orifice. This design is what causes the ruptures, as explained in detail

below.

206.　The housing components of the ARC hybrid inflators consist of an upper pressure vessel, a lower pressure vessel, and a center support. Each piece of the DCADH inflator sections is illustrated below:



*Above: A side-view drawing of sections of the ARC hybrid DCADH inflator sections.*

207.　During assembly, ARC joins each of these three pieces of metal together. During the relevant period, ARC's design process specifications provided for these component parts to be joined using friction welding; a process carried out pursuant to the specific designs of ARC, the Vehicle Manufacturers, and the Airbag Module Suppliers. Friction welding generates heat through mechanical friction between a moving component and a stationary one, while at the same time applying a lateral force (or pressure), called an "upset," to the parts. This displaces and ultimately fuses the material. Friction welding is a process carried out pursuant to a

specific design; "no operator skill is involved."[40]



*Above: Examples of friction welding techniques.*

208. The ARC hybrid inflators utilize three separate friction welds. The order in which the welds are performed are different for the driver and passenger inflators. For the driver's inflator, in the CADH and DCADH, the first friction weld is between the upper pressure vessel and the center support. The second friction weld is between the center support and the lower pressure vessel. The third friction weld joins the lower and upper pressure vessels together. Friction welds two and three are performed during the same operation. All relevant driver side inflators are

---

[40] Thompson Friction Welding, "A Practical Guide to Friction Welding," Sept. 26, 2004, at 30.

substantially similar in their design and manufacturing, and all were defective when they left ARC's facilities.



**Left: Friction weld (1). Right: Friction welds (2) and (3).**

209.    For the passenger's inflators, in the PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage), the first friction weld is between the lower pressure vessel and the center support. The second friction weld is between the center support and the upper pressure vessel. The third and final friction weld joins the lower and upper pressure vessels together. Friction welds two and three are performed during the same operation. All relevant passenger side inflators are substantially similar in their design and manufacturing, and all were defective when they left ARC's facilities.



*Left: Friction weld (1). Right: Friction welds (2) and (3).*

210.  "Slag" or "flash," the excess metal that that collects at the seam or joint of the two pieces being adjoined, is a natural byproduct of most welding methods, including friction welding. In ARC's Defective Inflators, flash is created at each of the seams between the joined parts, both on the exterior and interior of the airbag inflator.

211.  Controlled and consistent flash formation is a normal and expected byproduct of the friction welding process. In the illustrations below, the flash is uniform and materializes in a "ram's horn" shape (so named because it resembles a ram's horn). Such flash is uniform, symmetrical, and stable. That is, it does not contain odd or irregular shaped pieces. It does not have pieces hanging on by thin, unstable connections, and thus, will stay in place. In other words, it will not block ventilation exit orifices or otherwise interfere with airbag deployment, an inherently turbulent process.



*3D Model showing center tube to lower pressure vessel flash in*
*"ram's horn shape."*

212.  Notably, friction welding is a design choice that ARC made. Not all toroidal airbag inflators are joined using friction. There are multiple types of welding, including, for example, laser welding, which does not produce flash. And friction welding – when the proper components are matched with proper machinery, specifications, and techniques – can also produce uniform flash in the "ram horn" shape discussed above. That, however, is not what ARC chose.

213.  ARC designed a process that generated asymmetrical, brittle, and sometimes excess weld flash along the internal seams of its friction welds. If certain parameters, such as part-to-part alignment, rotational speed, the force applied to the parts being welded, or the machine's balance, among other things, are out of specification during the friction welding process, such asymmetrical flash will collect at the joint of the parts being welded. ARC's friction welding process allowed for the chance that asymmetrical and brittle weld flash could form at the seams of any inflator. Without designing a procedure to confirm no irregular flash had formed, which it did not implement until 2018, whether or not a vehicle's inflator contains such irregular flash is unpredictable and unknown.

214.  From the introduction of its hybrid inflators in 2000, through 2017, ARC did not physically check the quality of the interior friction welds, nor did it have any controls in place to identify asymmetrical flash occurring inside of the

Defective Inflators. The pictures below show the asymmetrical weld flash collected in the interior of an ARC inflator at the union of the center support and upper pressure vessel. Unlike the weld flash in the illustrations above, the flash at this point in the inflator is not symmetrical or uniform.

*Actual Picture of Asymmetrical Internal Weld Flash*



*Flash on the inner diameter of the support tube of
an exemplar ARC Defective Inflator*



*Excess asymmetrical weld flash at the support tube inner diameter to*

*upper pressure vessel interface in field collected ARC hybrid inflators*



215.   When the asymmetrical weld flash is exposed to the gas flow through the gas ventilation exit port generated during the deployment, pieces of the flash in proximity of the exit port are at risk of dislodging. If the dislodged weld flash is large enough to block the gas exit port, the dislodged weld flash restricts gas exiting and will result in an increase of pressure in the inflator housing. As the internal pressure of the inflator increases due to the gas exit port restriction, the toroidal metal housing expands, deforms, and changes shape from the toroid shape to more of a ball shape until it reaches the point of rupture.

216.   During a driver side rupture of an ARC hybrid inflator, the inflator housing expands due to the excessive internal pressure. This stretches the center support because it is welded to the top and bottom portions of the inflator housing. Eventually the center support violently fractures in line with the gas flow, and the center support and the upper pressure vessel are propelled towards the occupant.

217.   When the inflator housing ruptures, internal components of the inflator can be ejected as gas pressure ventilates into the passenger compartment, which can

injure or kill the occupants. In addition to propelling internal inflator components toward the driver, the entire module assembly may also break free of the steering wheel and strike the driver which can cause injury or death.

218.   In its recall of one manufacturing lot of ARC passenger-side inflators, Ford noted that, "[p]reliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port."[41] If the ARC welding process incorporated into the design of the inflators allows weld flash, or pieces of weld debris, to block exhaust ports, the PSAN can exacerbate the over-pressurization and lead to an explosive rupture.

219.   This is a design defect, which can allow undetected pieces of weld flash to obstruct the single, static exhaust port and cause the airbag inflator to explode.

220.   As noted, a reasonable alternative design was to select a welding method or type of machinery that produced stable and uniform weld flash. But ARC had other options as well. It could have incorporated more robust pressure relief valves into its design or included multiple exit ports to the inflator. A pressure relief mechanism would have mitigated the dangers of both PSAN-related over-pressurization and ruptures caused by a restricted gas exit port.

221.   ARC was aware that utilizing a pressure relief mechanism would mitigate the dangers of both PSAN-related over-pressurization and those ruptures

_____

[41] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.

caused by a restricted single gas exit port. According to a *New York Times* article, as part of its efforts to mitigate the known dangers associated with PSAN, in the early 2000s, ARC's competitor, TRW, incorporated a pressure relief valve in its PSAN-based inflators that allowed gas to escape should the inflator begin to over-pressurize.[42]

222.   In fact, ARC has designed inflators that do contain such a mechanism. In February 2013, for example, ARC filed a patent entitled, "Variable Orifice Construction," that would allow the inflator to increase the size of the exit orifice when the internal gas pressure was rising.[43] Although the patent mentions that the flexible orifice size is needed because some propellants result in higher pressure than others, it does not mention the fact that the invention would also reduce the chance of a flash nugget blocking the orifice enough to cause a rupture.

223.   In December 2020, ARC implicitly acknowledged both that its current design allowed for weld flash to partially block the exit orifice and that its current design did not adequately ventilate excess gas when it filed a patent application entitled, "Airbag Inflator With Pressure Relief Valve and Increased Combustion

---

[42] "A Cheaper Airbag, and Takata's Road to a Deadly Crisis," N.Y. Times, Aug. 26, 2016.
[43] U.S. Patent 8,770,621 B1, Variable Orifice Construction, filed Feb. 26, 2013, pub. July 8, 2014.

*Footnote continued on next page.*

Efficiency."[44]

224.   In the patent, ARC stated:

Some existing inflator assemblies utilize a center support structure that requires two simultaneous welds, which is problematic in respect of manufacturing and also increases the potential for weld particles to exit the inflator upon deployment. Existing designs have also been configured to fragment during deployment as a consequence, in the event of excessive pressure increase within the inflator due to some failure or external condition or the like, these existing inflator designs can be potentially hazardous for vehicle occupants.[45]

225.   ARC continued, "[i]t would be desirable to provide an airbag inflator that reduces gaseous effluents with efficient combustion while incorporating additional safety features in respect of venting and unintended increased in internal pressure and weld particles."[46] ARC proposed a hybrid inflator design in which "[t]he multiple sub-chambers are connected to one another via control vents. A canister lid with vent holes encloses the energetics canister. A flow diverter is placed into the booster can retain the energetics cover to the energetics canister and to further direct and control pressure and flow before exiting the top vessel via a control orifice."[47]

226.   The inflator would also have flow diverters to "further direct and

---

[44] U.S. Patent 2022/0185224 A1, Airbag Inflator With Pressure Relief and Increased Combustion Efficiency, filed Dec. 11, 2020, pub. June 16, 2022, at 10 (emphasis added).

[45] *Id*. (emphasis added).

[46] *Id*.

[47] *Id*.

*Footnote continued on next page.*

control pressure and flow before exiting the top vessel."[48] Finally, the inflator would have a pressure relief mechanism in the bottom portion of the inflator "in the event of excess internal pressure without any rupture of the inflator during a deployment event."[49] During manufacturing, ARC would conduct hydroburst tests to confirm that the pressure relief mechanism works in the case of an over pressurization.

227. Further, ARC knew about the defect and the potential for inflator ruptures but failed to implement meaningful manufacturing process changes and effective quality control systems until 2018. In 2018, ARC implemented manufacturing process changes, including a borescope system to visually inspect 100 percent of the upper vessel to support tube friction welds prior to sale. Implementing this quality control measure sooner was a preventable means to stop Defective Inflators from reaching and endangering tens of millions of consumers.

228. This is not the first time that ARC has been accused of improper/defective welding. During the infamous Takata recalls, the bankrupt successor entity to Takata Corporation, Reorganized TK Holdings Trust, sued ARC, alleging that ARC provided Takata's U.S. subsidiary, TK Holdings, Inc., with defective side airbag inflators which caused TK Holdings' customer (General Motors) to issue a recall on its vehicles manufactured during the period the defective

---

[48] *Id.*

[49] *Id.*

*Footnote continued on next page.*

inflators were supplied by ARC. TK Holdings, Inc. alleged, *inter alia*, damages arising from breach of contract.[50]

229.   As alleged by TK Holdings, Inc., "ARC's inflators failed due to improper/defective welding."[51] As aptly stated by TK Holdings, Inc., "[t]he inflators provided by ARC were not reasonably fit for their intended, anticipated, or reasonably foreseeable use." Accordingly, the defective inflators suffered from the additional issue of poor process control.

### E.   NHTSA Concludes That ARC Inflators Are Defective

#### 1.   Preliminary Evaluation and Engineering Analysis

230.   In July 2015, NHTSA's Office of Defects Investigation ("ODI") opened a Preliminary Evaluation (PE15-027) into 490,000 ARC driver side hybrid airbag inflators manufactured between 2001 and 2004, based on the two ruptures it was aware of. In the opening resume, NHTSA stated the inflators "may rupture during frontal air bag deployment resulting in metal fragments being propelled into the passenger compartment." NHTSA opened the investigation because, in December 2014, it received notice of a rupture that occurred in 2009 involving a 2002 model year Chrysler Town & Country, as well as notice in June 2015 of a rupture in a 2004 model year Kia Optima. When NHTSA realized that both inflators

---

[50] *Reorganized TK Holdings Trust v. ARC Auto., Inc*., Bankr. D. Del., No. 1:19ap50266, Complaint, June 24, 2019.
[51] *Id*.

*Footnote continued on next page.*

were ARC hybrid inflators, it opened the investigation.[52]

231. After requesting and receiving some information on design, manufacturing, and quality control processes covering the relevant inflators, NHTSA issued several standing general orders ("SGO" or "SGOs"), including SGO 2015-01, SGO 2015-01A, SGO-2015-02, and SGO 2015-02A. These SGOs were directed not only at ARC but also certain Vehicle Manufacturers – and required each entity to timely report information about field ruptures upon notice.

232. In March 2016, NHTSA met with ARC at its Knoxville, Tennessee headquarters, a representative of Hyundai-Kia, and the relevant Tier 1 supplier. On information and belief, as is custom in the industry, Hyundai-Kia, the relevant Tier 1 supplier, and ARC communicated prior to meeting with NHTSA.

233. NHTSA, ARC, each of the Airbag Module Suppliers, and the Vehicle Manufacturers responsible for the vehicles affected by this issue (inflators manufactured between 2001 and 2004) continued meeting to determine how to evaluate the propensity for the Defective Inflators to fail. The result was a program whereby ARC, the relevant Vehicle Manufacturers, and the relevant Airbag Module Suppliers collected and tested Defective Inflators from the field.

234. Because the initial round of testing did not include a sufficient number of inflators, the ARC, the relevant Vehicle Manufacturers, and the relevant Airbag

---

[52] NHTSA, Investigation PE15-027, ODI Opening Resume, July 13, 2015.

Module Suppliers expanded the collection efforts. ARC, the Vehicle Manufacturers, Airbag Module Suppliers, and NHTSA decided that the appropriate number of airbags to test was 459 inflators of each type. This would be a total of 918 inflators, 459 single-level CADH and 459 dual-level CADH. The relevant Vehicle Manufacturers supplied VIN numbers for the vehicles at issue and agreed to a testing process. Roughly, the process went as follows: the Vehicle Manufacturers located the relevant inflators and shipped them to ARC's lab in Knoxville, Tennessee, for testing. ARC inspected and x-rayed each inflator, deployed them in test tanks, and recorded any ruptures. ARC shared this data with both NHTSA and the Vehicle Manufacturers.

235.   Ultimately, by May 2018, ARC's testing was complete, and it claimed that none of the inflators ruptured.

236.   While this process was underway, in August 2016, NHTSA upgraded the Preliminary Evaluation to an Engineering Analysis (EA16-003), which is a more in-depth, detailed investigation. During its Preliminary Evaluation, NHTSA learned that GM and Hyundai also used airbag modules that contain ARC hybrid driver inflators.[53] NHTSA upgraded and expanded the investigation to all ARC inflators installed in U.S. vehicles after learning about a fatal rupture in a 2009 Hyundai Elantra that occurred in Canada in July 2016.

---

[53] NHTSA, Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.

237. In its "ODI Resume" (a technical form completed as part of the NHTSA investigation process) announcing the Engineering Analysis, NHTSA noted the inflators involved in the three known field incidents had ruptured in "substantially the same manner" and were "assembled using substantially the same manufacturing process."[54] NHTSA's stated focus was to determine how many ARC driver inflators were in vehicles in the United States and to collect more ARC inflators from the field to test and evaluate them to determine a root cause.[55]

238. When NHTSA opened EA16-003, it issued a series of information request letters to Tier 1 suppliers that utilized ARC's hybrid toroidal inflators, and the relevant Vehicle Manufacturers. The letters focused on information for front airbag modules using hybrid toroidal shaped ARC inflators. In NHTSA's information request to ARC, NHTSA stated, "[t]o assist us at this stage of the investigation, we are requesting certain information concerning all toroidal shaped frontal air bag inflators manufactured by ARC that were subsequently supplied to a Tier 1 or other air bag system manufacturer, for incorporation into their completed air bag modules…from the start of production (SOP) up to the date of this letter."[56]

239. NHTSA has not publicly released most of the documents filed in the EA16-003 investigation. It has posted the letters it sent to various Vehicle

---

[54] *Id.*

[55] *Id.*

[56] NHTSA, EA16-003, Ltr. to ARC, Aug. 9, 2016.

Manufacturers, Tier 1 Suppliers, and ARC on its website, but not the companies' responses.

240. At some point in 2016, NHTSA further learned that some of the LAT for ARC's inflators involved poor welds on passenger hybrid 7 (PH7) inflators. NHTSA accordingly sought information about this issue from ARC under SGO 2016-01. ARC met with NHTSA to address this issue as well.

241. In October 2016, NHTSA published a letter it sent to ARC chastising the company for failing to respond to its requests. This strongly worded letter puts the lie to ARC's claims in its May 2023 letter that it has completely cooperated with NHTSA. The letter from NHTSA states, in part:

242. Furthermore, beyond ARC's lax response to compulsory process, ARC's attitude and approach to NHTSA's investigation remains troubling. Since this investigation was opened, ARC has on more than one occasion questioned the necessity of providing certain information, failed to provide documents in a readable format, appeared nonchalant in its approach to developing a testing plan or protocol, and has advocated for the closure of the investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures.

243. Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These

incidents range from testing failures to recalls and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify NHTSA of these incidents, or their potential relationship to the incidents under investigation. After NHTSA learned of one of these incidents earlier this year, NHTSA contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised NHTSA staff for indicating otherwise.

244.    Compounding ARC's failure to inform NHTSA of these matters, ARC has also failed to comply with Standing General Order 2015-02A, issued in the underlying Preliminary Evaluation, which requires ARC to file a report within five days of receiving notification of an inflator field rupture. On July 8, 2016, a fatal rupture occurred in Newfoundland, Canada. NHTSA was notified of this incident on by both Transport Canada and by Hyundai. Although ARC was clearly notified of the incident, as demonstrated by ARC's attendance at an inspection of the vehicle that occurred on July 26, 2016, ARC has failed to provide any report to NHTSA regarding that incident. As noted by the Standing General Order, failure to comply

with that obligation calls for the imposition of daily civil penalties.

245. ARC's response to NHTSA's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues. ARC has been given every consideration, yet has failed to respond in kind…[57]

246. In April 2017, NHTSA once again sought further information from ARC, this time through a special order with 56 requests for information directed at all of the inflators ARC had ever produced.

247. Shortly after NHTSA issued these requests, ARC, the Vehicle Manufacturers, NHTSA, and Airbag Module Suppliers formed what they term the "Collaboration Team" or the "ARC Joint Task Force." The purpose was ostensibly to investigate the ruptures of ARC's Defective Inflators. Ultimately, the Collaboration Team presented its findings to NHTSA.

248. Although publicly available documents do not make it clear, it is apparent that the Collaboration Team determined that ARC's welding design was faulty. ARC admits that, following this presentation to NHTSA, it "implemented

---

[57] NHTSA, EA16-003, Ltr. to ARC, Re: ARC's Response to EA16-003, Oct. 4, 2016, at 3 (emphasis added).

changes to the weld schedules of the existing IFW friction welders and implemented an automated borescope inspection system." It also "invested in capital improvements through the acquisition of state-of-the-art Izumi friction welders." ARC agrees that these were "corrective actions." These changes are confirmed by documents included in the EA16-003 document request, which state that ARC implemented equipment and process improvements on all toroidal inflator assembly lines on January 31, 2018.

249.   In August 2020, NHTSA requested additional information specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."[58] Regarding the PH7 inflator, NHTSA focused on a time frame "defined by a) a starting point of June 1, 2014, the inflator build date of a confirmed field event, and b) the end point of January 31, 2018, the implementation date of equipment and process improvements by ARC on all toroidal inflator assembly lines."[59] NHTSA sent similar letters requesting information about the PH7 passenger hybrid inflator to vehicle manufacturers Volkswagen, BMW, Fiat Chrysler, GM, Toyota, Kia, and Hyundai.

250.   In April 2021, NHTSA posted a memorandum to the public file for

---

[58] NHTSA, EA16-003, Ltr. to ARC Automotive, Inc., Aug. 18, 2020.
[59] *Id.*

EA16-003 stating that it was reviewing ARC's responses to redact all personally identifiable information and that these types of responses "are usually complex, contain large volumes of documents, and require additional time for review and redaction."[60] NHTSA asserted that, "[t]he public version of the response will be posted to this investigation file when available." The response has yet to be publicly posted.

251.   On August 31, 2022, NHTSA called a meeting that included ARC, all of the Vehicle Manufacturers, and all of the Airbag Module Suppliers. At the meeting, NHTSA revisited the history of the investigation and indicated that it would issue further information requests. It issued those requests in December 2022 and sought information about ARC's process changes, as well as the "accept/reject quantities" from the time that ARC started using borescopes to check its interior welds. ARC responded to NHTSA in February of 2023. The "accept/reject" rates are not yet public.

252.   On April 25, 2023, NHTSA met with GM to inspect a 2017 Chevrolet Traverse in which the driver inflator ruptured during a crash. Two days later, on April 27, 2023, NHTSA issued a letter to ARC requesting that it recall all 67 million of its Defective Inflators. In this letter NHTSA:

tentatively concluded that a defect related to motor vehicle safety exists

---

[60] NHTSA, EA16-003, Memo. Re: Response to Information Request, Apr. 13, 2021.

in the frontal driver and passenger airbag inflators under investigation that were produced before installation of borescopes on all toroidal inflator manufacturing lines in January 2018 ("subsequent inflators"). . .

NHTSA demanded that ARC issue a Part 573 Recall report to address the defect.

253. NHTSA confirmed that through January 2018, ARC supplied 67 million of the Defective Inflators to six Tier 1 airbag system manufacturers. Of the 67 million, 11 million were manufactured by Delphi (now owned by Autoliv) under a license from ARC. The Defective Inflators have been installed in cars manufactured by at least 12 vehicle manufacturers.

254. NHTSA confirmed what is outlined above – and in the original complaints transferred to this Court – that ARC's friction welding generates weld slag or flash. If that slag or flash breaks loose during deployment it will follow the air flow through the sole exit port. Because there is only a single exit port in ARC inflators, pieces of flash may (and sometimes do) block the exit port. This leads to a rupture of the airbag inflator and sends shrapnel into the vehicles and towards passengers.

255. NHTSA noted (as discussed *infra*) that, to date, the Vehicle Manufacturers have addressed the Defective Inflators only by issuing recalls limited to the lots associated with a failed airbag inflator. Despite all of this information and ARC's own claims of cooperation, NHTSA noted that ARC had not determined there was a defect or that a recall is necessary.

256. NHTSA explained that a defect is a motor vehicle or motor vehicle equipment that exposes the public to an "unreasonable risk of death or injury in an accident . . ." 49 U.S.C. § 30102(8). NHTSA concluded that a "defect that occurs in an essential component of a piece of motor vehicle equipment, such as in this matter involving a frontal air bag inflator, presents an unreasonable risk to safety." Stating the obvious, NHTSA determined that an "airbag inflator that ruptures when deploying in a vehicle is plainly defective." NHTSA also found that the number of ruptures and/or field events at issue were not "de minimis." Those events are discussed below in further detail.

## 2. Early Injuries, Deaths, and Piecemeal Recalls

257. There have been at least 10 known ruptures of ARC's Defective Inflators in vehicles, including seven driver inflators and three passenger inflators. Two of those ruptures resulted in driver fatality. Additionally, two passenger inflators ruptured during LAT at ARC's factory. Five of the ruptures resulted in significantly limited recalls of other vehicles that contained other inflators only from that lot. The most recent rupture resulted in a larger-in-scope recall by GM but was still isolated to one inflator variant. On information and belief, there have been multiple other inflator ruptures, either in the field or in testing, that have not been publicized.

258. The Defective Inflators themselves were manufactured at various ARC factories and include both dual-stage (which has a two-stage deployment based on

the severity of the crash) and single-stage (which deploys at the same rate no matter the crash severity) inflators. They all, however, share common defects. For example, all the components were joined with friction welding that used the same or substantially similar parameters that produces asymmetrical flash on the interior seams of the inflator compartment. In fact, there are documented field and LAT ruptures on inflators produced from multiple manufacturing facilities, *infra*. Moreover, all the inflators have a single exit port, and none were designed with an adequate pressure relief mechanism as discussed above in ¶¶ 278-302 to prevent a rupture. All contained PSAN in their secondary propellant, posing a risk of an exponential increase in pressure and, consequently, the risk of a rupture. These facts strongly suggest a systemic design defect in the inflators rather than a manufacturing defect occurring at one location, for one lot, for a short period of time, due to a non-conforming assembly process.

259.   Little is publicly known about the ten field ruptures. News reports have largely reported only on the information provided by NHTSA in the few investigation documents it made public. News reports about the two fatal incidents do not include information about the drivers or their locations.

260.   The following is what is known about each rupture and recall thus far:

a.      **The 2009 "Dutton Rupture"**

261.   In January 2009, in Ashtabula County Ohio, an ARC DCADH ruptured

in a 2002 Chrysler Town and Country minivan severely injuring Lois Dutton.[61] According to Ms. Dutton, "[i]t broke my jaw in three places. Collapsed a lung." The inflator was a dual-stage hybrid inflator manufactured at ARC's Knoxville, Tennessee, facility.[62] It even sent shrapnel through her chest and out of her back. Ms. Dutton spent three months in a medically induced coma after the incident and faced hundreds of thousands of dollars in medical bills.

262.   The Dutton ARC rupture was attributed to a "single isolated event" and no actions were taken. This occurrence and write-off as a "single isolated event" is very similar to what occurred in the Takata recall with what is known as Event Zero. Event Zero was the first field rupture of a Takata PSAN PSDI inflator, and instead of performing a thorough investigation, Takata and Honda wrote it off as an "anomaly" and only took any action when additional field ruptures took place three years later.

### b.      The 2014 Kia Optima Rupture

263.   On April 8, 2014, the ARC driver inflator in a 2004 Kia Optima ruptured during a frontal impact crash in New Mexico.[63] The driver suffered serious injuries. The inflator was a single-stage inflator made at ARC's Knoxville,

---

[61] NHTSA, Investigation PE15-027, ODI Opening Resume, July 13, 2015.
[62] *Id.*
[63] *Chavez v. Kia Motors Corp.*, D.N.M., No. 1:15-cv-00462, First Amended Complaint, June 25, 2015.

*Footnote continued on next page.*

Tennessee, facility.[64] The driver sued Kia Corp. and Kia America, Inc., under their previous names, and the lawsuit was settled quickly. Kia did not issue a recall. In its investigation, NHTSA indicated that this inflator was placed in a Delphi Automotive Systems Corp. airbag module. Delphi was acquired by Autoliv in 2009.

### c. The 2016 Hyundai Elantra Rupture

264.    On July 8, 2016, the driver of a 2009 Hyundai Elantra was killed in Canada when an ARC driver inflator exploded during a crash.[65] This inflator was a single-stage inflator made in ARC's China facility.[66] Hyundai later recalled 2,022 MY 2009 Elantra vehicles in Canada, but did not issue a recall in the United States.[67] This recall was performed to collect parts for Transport Canada defect investigation 3280-38-10 in an effort to aid in the analysis by Hyundai and Transport Canada. The recovery program ended on February 5, 2020, with a note stating: "No safety defect has been identified with these vehicles and this action is not being conducted under the requirements of the Motor Vehicle Safety Act."

### d. The 2017 BMW Lot Qualification Rupture and Recall

265.    On February 8, 2017, a Tier 1 supplier, Key Safety Systems notified

---

[64] NHTSA, Investigation PE15-027, ODI Closing Resume, Aug. 25, 2016.
[65] "1st Recorded Canadian Fatality from Airbag Inflator Rupture Under Investigation," CBC News, Aug. 4, 2016.
[66] NHTSA, Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.
[67] Transport Canada, Recall No. 2018-173, Apr. 11, 2018.

*Footnote continued on next page.*

BMW that an ARC DPH-7 passenger hybrid inflator intended for BMW ruptured during a quality check or LAT at an ARC facility on January 29, 2017.[68] The DPH-7 inflator was manufactured at ARC's Reynosa, Mexico, facility.[69] On March 21, 2017, BMW issued Recall 17V-189 for 36 vehicles equipped with ARC DPH-7 passenger front inflators.

266.   The DPH-7 uses the same friction welding process as both the CADH and DCADH. According to the Part 573 Safety Recall Report:

> Depending on the circumstances, impaired gas flow could create excessive internal pressure, which could result in the body of the inflator rupturing upon deployment. Metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

267.   This recall, however, fails to include all BMW vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

### e.    The 2017 Ford Lot Rupture and Recall

268.   On July 31, 2017, Ford was notified that an ARC PH7-120 dual-stage passenger inflator had ruptured during LAT at ARC's facility.[70] Ford's airbag module was assembled by Takata Corporation, which was subsequently acquired by

---

[68] BMW, Recall No. 17V189, Part 573 Safety Recall Report, Mar. 21, 2017.
[69] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.
[70] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.

Key Safety System and later incorporated into Joyson Safety System. According to ARC's presentation to NHTSA, the PH7 inflators were manufactured in four of its facilities: Knoxville, Macedonia, China, and Mexico.[71]

269.  On August 31, 2017, Ford issued Recall 17V-529 for 650 F-150 and Mustang vehicles equipped with ARC's PH7-120 dual stage passenger inflator which uses the same friction welding process as the DPH-7, CADH and DCADH. According to the Part 573 Safety Recall Report:

> July 31, 2017, The Tier 1 airbag module supplier notified Ford of an abnormal deployment of a passenger Airbag (PAB) inflator during a Lot Acceptance Test (LAT) conducted at the supplier's engineering facility. The inflator ruptured during full output at +65 Celsius.

270.  During August of 2017, the concerns outlined in the Part 573 Safety Recall Report were reviewed by Ford's Critical Concern Review Group ("CCRG") and its preliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port. LAT frequency was increased, and a Design of Experiments was initiated to further evaluate potential factors.

271.  This recall, however, fails to include all Ford vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their

---

[71] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.

vehicles.

**f.    The 2017 Chevy Malibu Rupture and Recall**

272.    On September 22, 2017, an ARC driver inflator ruptured in a 2011 Chevrolet Malibu during a crash in Pennsylvania.[72] GM recalled 1,145 model year 2010-2011 Chevrolet Malibu vehicles built with inflators from the same lot as the inflator that ruptured (Recall 19V019). GM did not specify the type of inflator but stated that it was manufactured in Mexico.[73] According to ARC's submission to NHTSA, the driver inflator that is manufactured at ARC's Mexico facility is a CADH (*i.e.*, ADH-C).[74] The airbag module was manufactured by TRW Automotive Holdings Corp., which has since been acquired by ZF Friedrichshafen AG to form what is commonly referred to as ZF-TRW.

273.    According to NHTSA, an ARC passenger hybrid inflator manufactured on June 1, 2014, ruptured in the field. NHTSA did not specify the make, model, and model year vehicle or the date of rupture.[75]

274.    This recall, however, fails to include all GM vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all

---

[72] *McQuaide v. Gen'l Motors LLC*, Pa., Allegheny Co. Ct. Com. Pleas, No. GD-18-007744, Third Amended Complaint, Jan. 29, 2019.
[73] Gen'l Motors, Recall No. 19V019, Part 573 Safety Recall Report, Jan. 31, 2019.
[74] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.
[75] *See, e.g.,* NHTSA, Investigation EA16-003, Investigation Response Ltr. to Volkswagen Group of Am., Inc., Sept. 14, 2020.

consumers, even the ones included in the recall, for the diminished value of their vehicles.

**g.    The 2021 Chevy Traverse Rupture and Recall**

275.    On August 15, 2021, a driver in Calumet, Michigan, was killed due to a rupture of the ARC driver hybrid inflator in her 2015 Chevrolet Traverse. The victim, who was driving with two of her children as passengers, collided with an oncoming vehicle that crossed into her lane, and her airbag deployed. According to the police investigation:

> [i]t appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag.[76]

276.    The police investigation report noted that the autopsy of the victim found parts of the metal airbag inflator lodged in her neck. The other passengers in the victim's vehicle, including an unbelted right front passenger and occupants in the second and third row seats, survived the crash.

277.    GM sent a contract field investigator to examine the vehicle on September 8, 2021, and, on September 14, 2021, another GM field investigator accompanied by the police investigator performed x-rays on the metal shards that

---

[76] Houghton Co. Sheriff's Off., Incident Report, Aug. 15, 2021.

were removed during the autopsy. Further inspection of the vehicle and airbag pieces were examined by counsel representing the victim's family, GM, ARC, and Toyoda Gosei (the Tier 1 supplier to GM) on October 27, 2021. The investigation report includes a photograph of the ruptured inflator, which is unrecognizable as an inflator due to the extent of the damage, as depicted below:



278. GM subsequently issued a recall of 552 model year 2008-2017 Buick Enclave vehicles and 2013-2017 Chevrolet Traverse vehicles (Recall 21V782).[77] As with its previous recall, GM recalled only inflators made from the same lot as the ruptured inflator that were used either as original equipment or replacement inflators. GM did not specify the type, stage, or manufacturing location for the inflator.

279. This recall, however, fails to include all GM vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all

---

[77] Gen. Motors, Recall No. 21V782, Part 573 Safety Recall Report, Oct. 7, 2021.

consumers, even the ones included in the recall, for the diminished value of their vehicles.

### h. The Second 2021 Chevy Traverse Rupture and Recall

280. On October 13, 2021, NHTSA confirmed that, just south of Lexington, Kentucky, there was another rupture of an ARC hybrid driver inflator involving a second 2015 Chevrolet Traverse.[78] Based on this incident GM issued Recall 22V-246 on April 14, 2022, for 2,687 vehicles including:

    a.    2015 Buick Enclaves (542)

    b.    2015 Chevrolet Traverses (1183)

    c.    2015 GMC Arcadias (962)

281. The chronology listed in the Recall 22V-246 Part 573 report states:[79]

On November 9, 2021, GM received a claim letter from an attorney representing the owner of a 2015 model year Chevrolet Traverse that was involved in a crash. On February 18, 2022, the claimant alleged that the front-driver airbag inflator in the vehicle ruptured during the crash.

GM was provided an opportunity to inspect the vehicle on March 23, 2022. GM determined, at that inspection, that the front driver airbag inflator in the subject vehicle ruptured during the crash deployment.

On April 7, 2022, GM's Safety and Field Action Decision Authority decided to conduct a safety recall on all front driver airbag modules containing an inflator from the same manufacturing lot as the inflator under investigation. GM is continuing to investigate this incident.

---

[78] *Second driver killed by airbag inflator from Tennessee's ARC*, Autoblog, Oct. 14, 2021, https://www.autoblog.com/2021/10/14/arc-airbag-inflator-death-gm-nhtsa-investigation/ (last accessed July 20, 2022).

[79] GM, Recall No. 22V246, Part 573 Safety Recall Report, Apr. 14, 2022.

GM's investigation has not identified another rupture allegation involving the vehicles in this recall population.

282.  This recall, however, fails to include all GM vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

### i.    The 2021 Audi A3 Rupture and Recall

283.  On December 18, 2021, the ARC passenger hybrid inflator in a 2016 Audi A3 ruptured during a crash in California, causing severe laceration injuries to the front seat passenger. An individual personal injury case was filed and remains pending.[80] In July 2022, VW recalled 1,216 vehicles, noting that although it had not yet determined a root cause, it was only recalling inflators from the same "suspect batch."[81] According to photos of an exemplar airbag installed in the 2015-2017 Audi A3, the passenger inflators are ARC PH7 hybrid inflators manufactured in Macedonia.[82]

284.  This recall, however, fails to include all Audi vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their

---

[80] *Barbone v. Khijniak*, Cal., Orange County Super. Ct., No. 30-2022-01254070-CU-PA-CJC, Apr. 8, 2022.
[81] VW, Recall No. 22V543 Part 573 Safety Recall Report, July 27, 2022.
[82] eBay, Audi A3 Right Passenger Dash Bag SRS Inflator Stk 21262 (last accessed Mar. 3, 2022).

vehicles.

j.     The 2023 GM Rupture and Recall

285.   On March 22, 2023, a driver side inflator in a 2017 Chevrolet Traverse ruptured in Michigan. This module was produced by Toyoda Gosei. On May 10, 2023, GM instituted a recall (NHTSA No. 23V334), stating that it:

> decided that a defect which relates to motor vehicle safety exists in certain 2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles. In these vehicles, the front-driver airbag inflator may contain a supplier manufacturing defect that may result in inflator rupture during deployment.
>
> Description of the Safety Risk: An inflator rupture may cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants.
>
> Description of Remedy Program: Dealers will replace the front-driver airbag module.[83]

286.   GM concluded that the "MC" variant inflator in these vehicles may rupture and "cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants." GM committed that once the parts are available, its dealers will replace the Defective Inflators in the front driver side but specified that only "MC" variant inflators were included. This recall included 994,000 vehicles.

287.   This recall, however, fails to include all GM vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all

---

[83] GM, Recall No. 22V334, Product Safety Recall Report, May 10, 2023.

Case 3:23-cv-00233-CLC-DCP     Document 1     Filed 06/30/23     Page 215 of 234
PageID #: 215

consumers, even the ones included in the recall, for the diminished value of their vehicles.

### k.    International Events

288.    In addition to the previously discussed July 2016 driver side air bag inflator rupture in a 2009 Hyundai Elantra in Canada, on October 16, 2017, a passenger side airbag ruptured in a 2015 Volkswagen Golf in Turkey. Joyson produced the airbag module, which also contained a Defective inflator manufactured in ARC's Knoxville, Tennessee facility.

### l.    Recall Summary

289.    The following chart summarizes the lot-based recalls, which cover only 1.2 million of the 67 million affected vehicles.

| Recall | Date | Manufacturer | Affected Vehicles | Population |
|--------|------|--------------|-------------------|-----------:|
| 17V-189 | 03/21/2017 | BMW | 2017 BMW X5 sDrive35i, X5 xDrive35i, X5 xDrive50i<br>2017 BMW X5 xDrive 35d<br>2017 BMW X5 xDrive40e | 36 |
| 17V-529 | 08/31/2017 | Ford | 2017 Ford F150<br>2017 Ford Mustang | 650 |
| 19V-019 | 01/31/2019 | General Motors | 2010-2011 Chevrolet Malibu | 1,145 |
| 21V-782 | 10/21/2021 | General Motors | 2008-2017 Buick Enclave<br>2013-2017 Chevrolet Traverse | 552 |
| 22V-246 | 04/14/2022 | General Motors | 2015 Buick Enclave<br>2015 Chevrolet Traverse | 2,687 |
| 22V-543 | 07/27/2022 | Volkswagen | 2016 Audi TT Roadster<br>2016 Audi TT Coupe<br>2016 Audi S3 Sedan<br>2016 Audi R8 Coupe<br>2016 Audi A3 Sedan<br>2016 Audi A3 e-tron<br>2016 Audi A3 Cabriolet<br>2016 Volkswagen Golf Sportwagen<br>2016 Volkswagen Golf R<br>2016 Volkswagen Golf GTI<br>2016 Volkswagen Golf A7<br>2016 Volkswagen E Golf | 1,216 |
| 23V334 | 5/10/23 | General Motors | 2014-2017 Buick Enclave<br>2014-2017 Chevrolet Traverse<br>2014-2017 GMC Acadia | 994,000 |
| | | | **Total Recall Population** | **1,286,000** |

290.    As evidenced above, the ARC hybrid inflators that have ruptured thus far vary in type, stage, and location of manufacture. Despite knowledge of the Defective Inflators and the growing number of ruptures, ARC has not recalled their demonstrably unsafe Defective Inflators, the Airbag Module Suppliers did not recall their air bag modules containing the Defective Inflators, and the Vehicle Manufacturers did not recall all their vehicles fitted with the Defective Inflators. As stated above, the Vehicle Manufacturers have issued only very limited recalls following actual ruptures, a pattern that follows the devastating Takata airbag inflator recalls that went on for many years and needlessly endangered vehicle occupants and resulted in injuries and deaths. Instead of proactively taking steps to ensure their products are safe as they are duty bound to do, ARC, the Vehicle Manufacturers, and the Airbag Module Suppliers' responses have been reactive and wholly inadequate.

291.    As of May 31, 2023, there has been limited public disclosure of the data requested by NHTSA from the Vehicle Manufacturers or ARC. The original requests for information surrounding the ARC inflator ruptures are dated August 4, 2016. The most recent documents provided to the public on the NHTSA website are dated from December 2022 and only include requests for additional information.

292.    According to a memo dated April 13, 2021, NHTSA states:

The manufacturer's response to the Office of Defect Investigation (ODI)'s information request for this investigation is being reviewed and

redacted to remove all personally identifiable information (PII) as required by federal law. These responses are usually complex, contain a large volume of documents, and require additional time for review and redaction. The public version of the response will be posted to this investigation file when available. While ODI's investigation is ongoing, we recommend that you periodically review this investigation file for additional documents and updates.

293. Over two years have passed since NHTSA claimed the public version of the documents would be made available and as of May 31, 2023, only 100 documents have been made public, most of which are NHTSA's requests, in stark contrast to ARC's representation that they turned over 2 tera-bytes of material during the investigation.

294. There are only two approaches available: (1) Recall all ARC hybrid toroidal inflators OR (2) wait until another field rupture takes place and recall the inflators of the same lot. ARC's "Wait and See" approach places drivers and passengers of vehicles that utilize an ARC hybrid toroidal inflator at risk. The two drivers of the 2015 Chevrolet Traverses involved in the August and October 2021 accidents were the latest guinea pigs the ARC used to identify two defective lots of ARC inflators and they will not be the last unless all ARC Defective Inflators are recalled.

295. In fact, in the October 4, 2016, letter from NHTSA to ARC's Chief Executive Officer, ARC's position on the seriousness of the matter was called out

quite clearly by Michael Brown, Acting Director Offices of Defect Investigation:[84]

> ARC's response to [NHTSA's] investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues.

296.    The Class Vehicles are not safe to drive. Due to ARC's failures, Plaintiff and Class Members are left with poor options: to be without the use of a vehicle; purchase, lease, or rent a new vehicle until ARC first issues and then completes the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time. These are all, obviously, entirely unacceptable alternatives.

## F.    The Class Vehicles

297.    Attached as Exhibit E is a table that identifies, to the best of Plaintiffs' knowledge, and without the benefit of discovery, the Class Vehicles equipped with ARC's Defective Inflators by make, model, and model year.

## G.    Defendant's Concealment of the Defect

298.    Like ordinary consumers, Plaintiffs reasonably believed when purchasing their Class Vehicles that the vehicles were equipped with safe airbags that did not have a dangerous propensity to shoot shrapnel into their faces, necks, torsos, and limbs or those of other vehicle occupants. Accordingly, the ordinary reasonable consumer would have considered the Inflator Defect to constitute an

---

[84] NHTSA, EA16-003, Ltr. to ARC, Aug. 9, 2016.

important and material part of deciding whether to spend money to purchase or lease a Class Vehicle.

299.   ARC, the Vehicle Manufacturers, and Airbag Module Suppliers were aware that consumers did not expect their airbags to be defective and had readily available means to convey that information to Plaintiffs and the Class—including through on-vehicle labeling, stickers, and placards, through owner manuals, brochures, and pamphlets, through advertising for the Class Vehicles, and through full and complete disclosure by way of recalls. Plaintiffs and the Class were exposed to such types of informational materials prior to purchasing or leasing their Class Vehicles, at the time of purchase or lease (through interactions with Vehicle Manufacturers' sales employees and other agents), and/or every day they sat in their Class Vehicles. Indeed, Defendant had one obvious location to convey a warning about an airbag defect, on the steering wheel itself, an item the driver cannot help but see before ever driving the car.

300.   Defendant nonetheless chose not to warn about or disclose the defect at any point in time. The Defendant's concealment succeeded because each entity in the chain between ARC and the Vehicle Manufacturers remained silent about the defect—resulting in the public, prospective purchasers and lessees, automobile dealerships, automobile retailers, and automotive repair and service facilities remaining unaware of the Inflator Defect, which successfully prevented any warning

to Plaintiffs and the Class. The foreseeable and intended effect of the Defendant's concerted silence was that they all continued to profit from the manufacture, marketing, sale, service, and use of the Defective Inflators and Class Vehicles equipped with those inflators—with consumers bearing all the safety risks and suffering economic losses as a result.

301. Defendant intended to mislead and in fact misled reasonable consumers—including Plaintiffs and the Class—through their concealment of the Inflator Defect. Defendant did so with the intent to generate and increase sales of their products, thereby increasing Defendant's relative share of the automotive components and automobile markets.

### H. Economic Injury to the Class

302. The Class Vehicles were worth less than the prices the Class Members paid for them. Neither the market nor any reasonable consumer would ignore the material danger involving an airbag shooting metal shrapnel into the driver and passengers when assessing the value of an automobile and whether to purchase or lease it. Consequently, Plaintiffs paid more for their Class Vehicles than they otherwise would have because of the Inflator Defect, or they purchased vehicles that they otherwise would not have purchased.

303. By concealing the Inflator Defect, Defendant distorted and misrepresented the true value of every Class Vehicle. Every Plaintiff and Class

member received a Class Vehicle with different characteristics and of different and substantially lesser value than they reasonably believed they were receiving. Accordingly, Plaintiffs and the Class did not realize the benefit of their bargain in purchasing and leasing the Class Vehicles, and their expectations as ordinary reasonable consumers were not met.

304.  For these reasons, every Class Vehicle was worth less than what Plaintiffs and Class Members paid for them.

## IV.  Tolling of the Statute of Limitations

305.  Plaintiffs and the Class had no knowledge of the misconduct and concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until August 2020 when the NHTSA expanded its Engineering Analysis to include "toroidal shaped hybrid air bag inflators, both passenger and driver side" and requested additional information from ARC specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."

306.  Plaintiffs and Class Members are consumers who purchased or leased Class Vehicles. No information in the public domain was available to the Plaintiffs and the members of the Class prior to August 2020 that revealed sufficient information to suggest that Defendant was involved in the misconduct or

concealment alleged herein. Therefore, the statute of limitations did not begin to run because Plaintiffs and the Class did not and could not discover their claims.

307.   In the alternative, the statute of limitations did not begin to run because the Defendant fraudulently concealed the Defective Inflators until at the earliest, August 2020. On information and belief, Defendant ARC and the Vehicle Manufacturer Defendants have known of the defects in their airbags since at least 2015. Defendant knew of the defects well before the Plaintiffs and many of the Class Members purchased the Class Vehicles, and have concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Airbag Defect.

308.   Plaintiffs and the Class had no means of obtaining any facts or information concerning any aspect of ARC's dealings with the Airbag Module Suppliers and Vehicle Manufacturers, much less the fact that they had engaged in the misconduct and concealment alleged herein. For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiffs and Class Members have alleged in this Complaint.

## V.   Class Action Allegations

309.   Unless otherwise stated, the term "Class" refers jointly and severally to the Class and to each of the State Subclasses. Excluded from the Class are: (a) ARC

and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class counsel, and (e) any person who timely and properly excludes himself or herself from the Class.

### A. Nationwide Class

310. Pursuant to Federal Rule of Civil Procedure ("Rules") 23(a), 23(b)(2), and 23(b)(3), Plaintiffs bring this action on behalf of a proposed Class defined as follows: "All consumers in the United States who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018."[85]

### B. State Subclasses

311. In addition and/or alternatively, the named Plaintiffs in this and the other transferred actions referenced herein bring a separate state subclass under the laws of their respective states. The State Subclasses consist of: "All consumers in their state of residence who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC

---

[85] At this early stage and without the benefit of discovery, Plaintiffs cannot determine with certainty each vehicle by make, model, and model year equipped with the Defective Inflators but have included those about which they are reasonably confident. Plaintiffs may amend their pleadings to add vehicles if they are identified in the discovery process.

between 2001 and 2018." The State Subclasses do not include: (a) ARC and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class counsel, and (e) any person who timely and properly excludes himself or herself from the Class.

312.   Consistent with Fed. R. Civ. P. 23(c)(5) which sanctions the creation of subclasses "[w]hen appropriate," Plaintiffs reserve their right to modify the Class and the State Subclasses as discovery progresses and at the class certification stage.

## C.     Numerosity (Fed. R. Civ. P. 23(a)(1))

313.   The members the proposed Class(es) are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Although the precise number of Class Members is unknown to Plaintiffs, on information and belief, the Class would easily number in the millions. Millions of Class Vehicles spanning nearly 20 model years potentially contain Defective Inflators. The Class and/or classes are thus comprised of numerous, geographically dispersed members who cannot be practicably joined.

314.   The true size of the Class and/or Classes are ascertainable through ARC's, the Vehicle Manufacturers', and Airbag Module Suppliers' business records and by other means.

**D.      Typicality (Fed. R. Civ. P. 23(a)(3))**

315.   Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and the Class and/or State Subclasses all purchased or leased a Class Vehicle containing Defective Inflators. All received less than the full value Class Vehicles due to the Inflator Defect and ARC representations and/or omissions. Class Members, like Plaintiffs, would not have purchased the Class Vehicles or paid as much had ARC not misrepresented the safety of the Class Vehicles or concealed and omitted to disclose the Inflator Defect, which was unknown to Plaintiffs and Class Members. And Plaintiffs and Class Members were exposed to the same or substantially similar misrepresentations and to the same omissions—namely, concealment of the Inflator Defect. In short, the claims all arise from a single course of conduct and each Class member would individually make similar legal and factual arguments to establish ARC's liability.

316.   There are no defenses available that are unique to the Plaintiffs.

**E.      Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) & 23(b)(3))**

317.   Plaintiffs and the Class are united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair, or replacement of the Class Vehicles or Defective Inflators, restitution, damages, and other available relief designed to redress ARC's wrongful conduct. This action involves questions of law and fact that are common to the Class(es) that are susceptible to common

answers and that predominate over any individual questions specific to any Class Members. These include:

d. Whether the ARC airbag inflators are defective;

e. Whether the Class Vehicles are equipped with Defective Inflators;

f. Whether Defective Inflators in the Class Vehicles pose an unreasonable safety risk or are otherwise material to reasonable consumers;

g. Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle had he or she known of the Defective Inflators;

h. Whether an ordinary reasonable consumer would have paid less money to purchase or lease a Class Vehicle had he or she known of the Defective Inflators;

i. Whether the Class and Subclass members were denied the benefit of their bargain as a result of the undisclosed defect;

j. Whether ARC had actual or constructive knowledge of the defect;

k. When ARC first had actual or constructive knowledge of the defect;

l.  Whether ARC had a duty to disclose the Defective Inflators before or at the time Plaintiffs and the Class(es) purchased or leased their respective Class Vehicles;

m.  Whether ARC had and have an ongoing duty to disclose the defect;

n.  Whether ARC breached their express and implied warranties for the Class Vehicles and Defective Inflators;

o.  Whether ARC violated governing laws prohibiting unfair and deceptive trade practices and other similar consumer protection laws of Plaintiffs' and the Class Members' respective jurisdictions;

p.  Whether ARC breached other duties or violated other applicable laws by their representations and/or by their omissions, including concealment of the Defective Inflators;

q.  Whether ARC breached their obligations to provide timely repairs for the Class Vehicles;

r.  Whether ARC should be declared legally and financially responsible for notifying the Class and Subclass members of the true and complete nature and extent of the Defective Inflators;

s.  Whether ARC should be declared legally and financially

responsible for notifying Class and Subclass Members of their right to reimbursement from ARC for the costs incurred in diagnosing, repairing, and replacing the Defective Inflators in the Class Vehicles;

t.   Whether and to what extent ARC is obligated to pay actual and consequential damages to the Class and Subclass Members as a result of the Defective Inflators;

u.   Whether ARC fraudulently concealed the Defective Inflators;

v.   Whether ARC misconduct was knowing and willful;

w.   Whether ARC should be obligated to pay punitive damages in connection with the claims brought in this action, and if so, the amount of those damages;

x.   Whether ARC was unjustly enriched by receiving Plaintiffs' and the Class Members' money for the Class Vehicles;

y.   Whether ARC should be ordered to disgorge all or part of the monies received from Plaintiffs and the Class in exchange for the Class Vehicles;

z.   Whether Plaintiffs and the Class are entitled to damages, injunctive relief, restitution, or other relief sought in this Complaint; and

aa.    The amounts to which Plaintiffs and the Class are entitled.

318.   The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by ARC, (c) predominate in number and importance over questions that may not be common to the class, and (d) preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class Members.

**F.    Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

319.   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members. Plaintiffs commit to protecting the interests of the Class(es) without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class(es) generally. Plaintiffs have retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases and product liability cases, including automobile defect claims. The firms and lead counsel for the firms retained by Plaintiffs also have substantial trial experience, individually and collectively. Plaintiffs and their attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class(es) and Plaintiffs' counsel have ample resources to do so.

### G.     Ascertainability

320.    The Defective Inflators manufactured by ARC are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Class Vehicle. As a result, the Defective Inflators follow a traceable physical chain of distribution from ARC to the Airbag Module Suppliers to the Vehicle Manufacturers to automobile dealerships and retailers and then to Plaintiffs and the Class.

321.    Defective Inflators that are incorporated into the assembly contain markings identifying ARC as the manufacturer on a small label on the component. Defective Inflators can therefore be physically traced through the supply chain.

322.    The identities of Class Members are ascertainable from various sources including Defendants' production and distribution records, Polk automotive data, vehicle ownership records, government ownership records, or via simple notice by publication.

### H.     Superiority

323.    The proposed class action is superior to the other means available to the Class to obtain relief. The damages suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation of the claims described here against ARC so that making the class whole in the absence of a class action is unlikely and impracticable.

324.    This means Class Members have relatively less interest in individually

controlling the prosecution of separate actions and it cannot be said that the interests of individuals pursuing individual cases in conducting separate lawsuits is so strong as to call for denial of a class action. Without class certification, the prosecution of separate consumer actions by individual Class Members would be impracticable and financially difficult and, therefore, unlikely.

325. Denial of class treatment runs the risk of establishing incompatible standards of conduct for ARC, discouraging the prosecution of meritorious but small claims, and it may result in adjudications which would be dispositive of the interests of other Class Members who are not parties to the adjudication, or otherwise substantially impair the ability of Class Members (and ARC) to protect their rights and interests.

326. ARC has no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be more burdensome to ARC than defending against all potential claims in a single forum and proceeding. Likewise, the judicial system has no interest in burdening numerous courts when the claims of this highly cohesive class can be fairly and efficiently concentrated and managed by this Court. Individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and to the courts, including this Court. By proceeding as a class action, the claims at issue can be

managed efficiently through economies of scale.

327.   Additionally, the claims are manageable, each Subclass claim is governed by one state's law and those laws are consonant with one another. ARC's misconduct impacts all Class Members, whose losses are capable of calculation on a class-wide or subclass-wide basis.

328.   Ultimately, the class action procedure is superior to other methods of adjudicating the Plaintiffs and Class Members' claims. This is precisely why class actions exist—class treatment facilitates the fair, uniform and efficient adjudication of claims, as it would here, and it promotes judicial economy while avoiding the undue financial, administrative and procedural burdens that necessarily would result from a multiplicity of individual actions.

## VI.   REALLEGATION AND INCORPORATION BY REFERENCE

329.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs and allegations of this Complaint, including the Introduction, all Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the Claims for Relief asserted on behalf of the Nationwide Class and the State Subclasses in Volume II of the Complaint.

*(the Complaint continues at Volume II concurrently filed herewith)*